Jeffery Lee WOOD, TDCJ No.
999256, Petitioner,

v.

Rick THALER, Director, Texas Depart-
ment of Criminal Justice, Correctional
Institutions Division, Respondent.

Civil No. SA–01–CA–423–OG.

United States District Court,
W.D. Texas,
San Antonio Division.

May 10, 2011.

■■■■■■■■■

J. Scott Sullivan, Law Offices of J. Scott Sullivan, San Antonio, TX, Jared Tyler, Tyler Law Firm, PLLC, Houston, TX, for Petitioner.

Eric J.R. Nichols, Beck, Redden, Secrest, LLP, Matthew Dennis Ottoway, Tina J. Miranda, Tomee Morgan Heining, Texas Attorney General's Office, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

ORLANDO L. GARCIA, District Judge.

Petitioner filed a motion to stay his execution in August, 2008, alleging therein that he was incompetent to be executed under the Supreme Court's holding in *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). This Court granted petitioner's motion for stay of execution, appointed counsel and multiple mental health experts to assist petitioner in the preparation of his *Panetti* claim, and held an evidentiary hearing in November, 2010. Having considered the parties' evidence and the applicable law, this Court finds factually incredible petitioner's claim that he currently suffers from a delusional belief system that renders him incapable of comprehending the true basis for his impending execution. For the reasons set forth at length hereinafter, petitioner's request for federal habeas corpus relief is denied, the stay of execution previously granted is vacated, and petitioner is denied a Certificate of Appealability.

### I. Statement of the Case

#### A. Petitioner's Offense, Capital Murder Trial, and State Appeal

'The facts of petitioner's capital offense and subsequent trial, direct appeal, and state habeas corpus proceedings are set forth in detail with record citations in this Court's opinion denying petitioner federal habeas corpus relief. *Wood v. Dretke*, 386 F.Supp.2d 820, 825–35 (W.D.Tex.2005), *CoA denied*, 214 Fed.Appx. 473 (5th Cir. 2007), *affirmed*, 491 F.3d 196 (5th Cir. 2007), *cert. denied*, 552 U.S. 1151, 128 S.Ct. 1087, 169 L.Ed.2d 825 (2008). The evidence at petitioner's trial established petitioner participated in a pair of armed robberies of convenience stores which culminated in the fatal shooting of store clerk Kriss Keeran by petitioner's accomplice Danny Reneau on January 22, 1996.

To summarize the evidence introduced during petitioner's capital murder trial, petitioner and his accomplice Danny Reneau were engaged in a string of armed robberies. Their last robbery took place at a convenience store where Kriss Keeran, who knew both petitioner and Reneau, worked. Reneau fatally shot Keeran during the course of the robbery.[1] After the robbery, Reneau and petitioner removed the store's safe, cash box, and the videotape of the robbery and fatal shooting from the store's video surveillance system. Petitioner drove the get-away vehicle to and from the robbery/murder. There was testimony at trial that Reneau and petitioner showed the video tape of their robbery and the fatal shooting of Keeran to petitioner's younger brother Jonathan before directing Jonathan to destroy the videotape.

After his arrest, petitioner gave two formal tape-recorded statements to law en-

---

**1.** Reneau was subsequently tried for Keeran's murder, convicted of capital murder, sen-

tenced to death, and executed by the State of Texas.

forcement officers. In both his statements petitioner admitted his role in Keeran's murder. In the first, petitioner attempted to downplay his prior knowledge of Re-

neau's plan to kill Keeran. In his second statement, however, petitioner admitted he knew Reneau planned to kill Keeran if Keeran resisted during the robbery.[2] In

2. The relevant portion of petitioner's interrogation was played for petitioner's jury at the guilt-innocence phase of trial:

"BUCKALOO: Or excuse me, when Danny went inside the store to take the money from Kris [sic], and the truth is what we are after, that his intention was to take Kris' [sic] life, and you knew that, correct?

"WOOD: Yes, only if he didn't cooperate.

"BUCKALOO: Okay. So, we know we are going to take Kris' life if he doesn't cooperate, correct?

"WOOD: Danny, not me.

"BUCKALOO: Excuse me, yes. But, you knew that Danny was going to take Kris' [sic] life if he failed to cooperate, correct?

"WOOD: Yes.

"BUCKALOO: So . . .

"WOOD: If he had the balls to do it.

"BUCKALOO: Okay.

"WOOD: Which he did.

"BUCKALOO: Well, obviously he had the balls to do it, as you say, but what I'm saying is that you're outside the store knowing that Kris (sic) is fixing to do a robbery of someone who you have spent the last several weeks with at different times, and the last hour or so with anyway. You are fixing to take a large sum of money, and by taking that large sum of money you know deep in your mind that you cannot leave a witness, correct?

"WOOD: Yeah.

"BUCKALOO: So, there is not any reason to believe at this time that you did not think that Kris [sic] . . . or that Danny was not gonna take Kris' [sic] life . . . if he failed to cooperate, okay?

"WOOD: Yeah.

"BUCKALOO: I ask that you speak loud.

"WOOD: Yeah.

"BUCKALOO: So, when you're kind of hoping that Kris will cooperate, but if Kris doesn't cooperate, you know that Kris is going to die.

"WOOD: Yeah. Yep.

"BUCKALOO: So, to ste (sic) there and to say that you didn't think that he would do it, or that you hoped he wouldn't do it isn't the truth because the fact of it is, is that Kris . . .

if Kris failed to cooperate, then he had to die, correct?

"WOOD: I guess so, I don't understand your question.

"BUCKALOO: If you knew that Kris is . . . is going to be robbed, if, and that Danny is going to do the robbery, if Kris does not cooperate and give the money, he's going to die, correct?

"WOOD: Yeah.

"BUCKALOO: So, what . . . why at that point did you even allow it to go on cause you know the bottom line is Kris is going to die.

"WOOD: No, because Kris always said that he would give up the money.

"BUCKALOO: You hoped he would give up the money.

"WOOD: I was hoping he would give up the money because he said he would.

"BUCKALOO: But when he didn't give up the money . . .

"WOOD: Danny shot him.

"BUCKALOO: And, that was not a surprise to you.

"WOOD: No. Well, it was a surprise, but it hadn't . . . we had planned it, but it was a surprise, a surprise that he did shoot him.

"BUCKALOO: But, like I'm telling you, it may have been a surprise, but it wasn't that big of surprise because this . . . Kris knows who is robbing him.

"WOOD: Yes.

"BUCKALOO: That's what I'm trying to get at is that Kris had to die. You know he was gonna to die [sic] if he failed to cooperate.

"WOOD: Yes.

"BUCKALOO: And, he did die because he failed to cooperate.

"WOOD: Yes.

"FLEMING: How did you expect not to be identified if you left Kris alive?

"WOOD: I didn't think Kris would say anything. That's how good of a friend he was.

"FLEMING: But your contingency was that if he cooperated, that he wouldn't tell anybody.

"WOOD: Yes.

fact, petitioner related that he and Reneau returned to their residence the day of the robbery/murder to obtain a gun that would be less noisy when fired.[3] Both of petitioner's tape-recorded statements were played in their entirety for the jury during the guilt-innocence phase of petitioner's capital murder trial.

Petitioner argued he was incompetent to stand trial. Based primarily on the testimony of Dr. Michael Roman (that petitioner made many grandiose statements about himself and was, therefore, delusional), in May, 1997, a jury found petitioner incompetent to stand trial. After spending several weeks at the Vernon State Hospital where petitioner was observed and tested by other mental health professionals, in October, 1997, a second jury found beyond a reasonable doubt that the petitioner was competent to stand trial.

A third jury convicted petitioner of capital murder in February, 1998. At that point, petitioner attempted to discharge his trial counsel. After a series of exchanges with the trial judge, however, petitioner was persuaded to allow his trial counsel to continue to represent him; nonetheless, petitioner insisted that his trial counsel introduce no mitigating evidence, cross-examine none of the prosecution's witnesses, and offer no argument during the punishment phase of trial. *Wood v. Dretke*, 386 F.Supp.2d at 828–33. Petitioner's trial counsel adhered to petitioner's directives. *Id.* The jury deliberated a little more than an hour before returning its verdict at the punishment phase of trial favorable to the prosecution. Based on the jury's unanimous verdict, the state trial court sentenced petitioner to death.

The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Wood v. State*, 18 S.W.3d 642 (Tex. Crim.App.2000). Petitioner did not seek further review of his sentence from the United States Supreme Court. Petitioner did file an application for state habeas corpus relief which the Texas Court of Criminal Appeals denied on May 9, 2001.[4]

---

"Fleming: And if didn't [sic] cooperate, then he had to be shot?

"WOOD: He would be shot by Danny, like I said if he ...

"FLEMING: And this was the plan that you and Danny ... this was the ultimate ... the final plan that was carried out that night after all these other ones had failed?

"WOOD: Yes.

"FLEMING: And, this is when you went to your house, you got the scope gun, you came back and this was the ultimate, final plan. You said 'this is it, if we're going to do it, we're going to do it now, and this is how it's going to work.' Right?

"WOOD: Yes.

"FLEMING: You go in, you point the gun at him, tell him what to do, if he doesn't do it, you shoot him?

"WOOD: Yes. It was just another plan.

"FLEMING: This was the final plan?

"WOOD: Yeah, this was the final plan, but I didn't think he was going to do anything, so

... but when he did, I did go in there and get the VCR and the gun from the desk.

"FLEMING: But, when the shots went off, you continued with the plan?

"WOOD: Yes.

"FLEMING: You thought, okay, he didn't cooperate, Danny had to shoot him. I'm gonna ... are you assuming he'd dead?

"WOOD: Yes.
S.F. Trial, Volume 25, at pp. 30–35

**3.** S.F. Trial, Volume 25, at p. 23.

**4.** As his ninth claim for state habeas corpus relief, petitioner argued he was incompetent to be executed under applicable Texas law and would, once he was given an execution date, file a claim to that effect. State Habeas Transcript, Volume I, at pp. 53–54.

The state habeas trial court issued an order on October 3, 2000 in which it set forth its findings of fact and conclusions of law, find-

*Ex parte Jeffery Lee Wood,* App. 45,500–01 (Tex.Crim.App. May 9, 2001).

### B. *Petitioner Attempts to Fairly Present his Panetti Claim*

Following the Fifth Circuit's affirmation of this Court's denial of petitioner's original federal habeas corpus petition and the Supreme Court's denial of certiorari, petitioner attempted to return to state court and argue that he is incompetent to be executed. The state trial court refused to appoint counsel to represent petitioner, refused to appoint a mental health expert to assist petitioner in presenting his incompetency claim, and refused to grant petitioner an evidentiary hearing.

More specifically, on or about August 14, 2008, far less than the 20 days prior to his scheduled execution required by applicable state law to obtain review by the Texas Court of Criminal Appeals,[5] petitioner filed a motion in his state trial court requesting appointment of counsel and appointment of a mental health expert to assist petitioner in investigating, developing, and presenting evidence supporting a claim that petitioner is currently incompetent to be executed and, thereby, at least temporarily exempt from the death penalty pursuant to the Supreme Court's then-recent decision in *Panetti v. Quarterman, supra,* and its prior decision in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

On August 17, 2008, the state trial court denied petitioner's motion with the cryptic notation "Motion Denied. Threshold showing required under 46.05 not met." In a per curiam opinion issued August 19, 2008, the Texas Court of Criminal Appeals dismissed petitioner's appeal from the trial court's denial of petitioner's motion, explaining it lacked both (1) appellate jurisdiction to review same due to the untimeliness of petitioner's motion and (2) direct authority under applicable state law to appoint counsel or experts to assist petitioner in his post-conviction proceeding. *Wood v. State,* AP–75,970, 2008 WL 3855534 (Tex. Crim.App. August 19, 2008).

### C. *Proceedings in this Court*

#### 1. *Motion for Stay*

In support of his motion for stay of execution, filed in this Court on August 19, 2008, *docket entry no. 37,* petitioner argued (1) his school records demonstrate he was diagnosed as exhibiting emotional difficulties as a child, (2) he was determined to be incompetent to stand trial in May, 1997 (but subsequently found competent only a few months later despite receiving no medical treatment or medication during the intervening period), (3) a diagnostician who examined petitioner in connection with petitioner's competency trials concluded petitioner suffered from delusional thought patterns which interfered with petitioner's ability to communicate effectively with his counsel, (4) a mental health evaluation conducted in con-

---

ing in part that petitioner was not then attempting to present a claim that he was incompetent to be executed but was merely notifying the parties of his intention to do so at a later date. State Habeas Transcript, Volume III, at p. 8.

5. In pertinent part, the Texas Code of Criminal Procedure provides the state's highest appellate criminal court may not review a trial court ruling on a motion challenging a con-

victed capital defendant's competence to be executed if the defendant filed his motion, as did petitioner herein, less than 20 days prior to his scheduled execution date. *Tex.Code Crim. Proc. Ann.,* Article 46.05(*l*–1) (Vernon Supp. 2010).

Petitioner has never offered this Court a rational explanation for his failure to timely file his motion for stay of execution in the appropriate state court.

nection with petitioner's original state habeas corpus proceeding shortly after petitioner's 1998 conviction, concluded, in part, "the client's understanding of the upcoming legal process is somewhat sophisticated. However, his ability to appreciate the consequences of those options or behave in a self-protective fashion is profoundly impaired and almost delusional," (5) various prison medical staff have noted instances of paranoid comments made by petitioner during his current incarceration, (6) petitioner has been treated for suicidal ideation and multiple suicide attempts during his current incarceration, and (7) petitioner has made numerous patently delusional comments to his federal habeas counsel suggesting petitioner possesses a completely unrealistic view of the manner whereby petitioner might one day obtain relief from his death sentence and release from his current custody.

This Court granted petitioner's motion for stay of execution, appointed counsel to represent petitioner herein, and authorized petitioner to retain the services of a mental health professional to help petitioner develop his *Panetti* claim. *Wood v. Quarterman*, 572 F.Supp.2d 814 (W.D.Tex. 2008).

### 2. *The Dueling Diagnosticians*
#### a. *The Report of Petitioner's Mental Health Expert*

Petitioner filed his *de facto amended* petition on March 23, 2009, accompanied by a copy of Dr. Michael A. Roman's 1997 report on petitioner, as well as a 1999 report on petitioner from a Gordon Potter, identified as a "M.Ed." *Docket entry no.* 65.

Respondent subsequently filed a supplement to his amended petition, along with a

September 21, 2009 report on petitioner from Dr. Roman in which Dr. Roman concludes (1) petitioner shows strong evidence of narcissistic thinking, (2) manifests paranoid thinking in relation to his legal situation, (3) there is no evidence of any specific neuro-behavioral disorder or major cognitive dysfunction, (4) petitioner nonetheless displays a persecutory delusion regarding his legal situation (because he maintains he is not guilty of the crime for which he has been convicted), (5) petitioner has "embraced a delusional belief system that is well formed, specific, and deeply held" and that "the specificity and intractability of his delusions have intensified" since 1996, and (6) petitioner is, therefore, not capable of clearly thinking about his sentence and pending execution. *Docket entry no. 83.*

More specifically, in pertinent part, Dr. Roman's report contains the following findings, conclusions, and opinions [6]:

*Delusional Systems:* In many respects, Mr. Wood demonstrates more realistic thinking about his legal situation than had been the case when evaluated by this examiner prior to his conviction. His statements and thought processes are less globally self-centered than they appeared to be nearly 14 years ago. He is more grounded in his understanding of the appeal process and how much of a role he can realistically play in influencing the appellate court.

The fact that he is more competent in his grasp and appreciation for legal procedures and his role within them appears consistent with the conclusions drawn by this examiner when Mr. Wood was first evaluated prior to his trial. At that time, it was argued that there was a good likelihood that his competence in

---

**6.** Because Dr. Roman's report was presented to this Court by petitioner in a typeface much too small to be read without considerable eye strain, this Court has reproduced herein substantial portions of Dr. Roman's report in a font and size much more reader friendly.

assisting his attorneys with his defense would improve if he were directly confronted with the reality over a sustained period of time. His conviction and the reality of prison have certainly accomplished this intervention. On the other hand, the specificity and intractability of his delusions have intensified. He seems to have embraced a delusional belief system that is well formed, specific, and deeply held.

A brief discourse on the nature of delusional disorder and delusional systems is warranted. A *delusion* is defined as a *fixed false belief.* The Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (DSM–IV) defines delusions as "A false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary." Delusions are common in many psychotic conditions such as schizophrenia, schizotypal personality disorder, and schizoaffective disorder. However, normal individuals often manifest delusional beliefs in the absence of disturbed reality testing, indicating that a psychotic disorder is not required for an individual to manifest a delusional belief system.

Several studies have demonstrated that normal adults in the general population demonstrate delusional beliefs. For example, studies of normal controls using the Peters *Delusions Inventory* indicates that adults without diagnosed psychopathology endorse an average of 6 to 8 delusional beliefs, depending on the specific research study cited. However, they typically endorse a low degree of distress, preoccupation, and conviction about these beliefs, particularly compared to patient populations with established delusions.

Delusions may be bizarre in their content or may be nonbizarre and involve plausible situations. In either case, delusional beliefs are irrational in that they persist despite evidence that would seem to refute them.

Five basic categories of delusional beliefs have been delineated. These include *erotomanic* (belief that someone is in love with you), *grandiose* (an inflated belief of self-importance or self-accomplishment), *jealous* (belief that one's significant other is unfaithful), *persecutory* (a belief that someone is "out to get you" or someone close to you), and *somatic* (belief that one has a physical or health problem). In addition, a *mixed* pattern of delusions is also recognized in which more than one type of delusion is present.

The DSM–IV–TR defines a *Delusional Disorder* as consisting of

A) Nonbizarre delusions ( . . . involving situations that occur in real life . . .) of at least 1 month's duration.

B) Absence of other symptoms that would meet the criteria for schizophrenia (i.e., hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms).

C) Apart from the impact of the delusions . . . functioning is not markedly impaired and behavior is not obviously odd or bizarre.

D) Delusions have not been primarily related to episodes of disturbed mood.

E) Delusions are not directly due to the use of a substance or a medical condition.

From this definition, it is clear that there is an appreciation for the existence of a lingering delusional belief system that is not related to a more primary

psychotic disorder. Delusional Disorder is one of the psychotic disorders within DSM–IV–TR, but the nature of the psychotic process is confined to the delusional belief system itself.

This definition would also exclude delusions that are created as a result of neurological insult or progressive neurological diseases such as dementia. These neurologically linked *delusional misidentification syndromes* involve interesting disorders such as Capgras delusion (a belief that close friend or family member has been replaced by an imposter), Fregoli delusion (a belief that familiar people are following you in disguise so you cannot recognize them), Cotard delusion (a belief that you are dead), mirrored-self misidentification (a belief that the person you see in the mirror is not you but rather a look alike), reduplicative paramnesia (a belief that a particular location has been duplicated and/or relocated), and somatoparaphrenia (a belief that some part of your body is not yours but belongs to another person—a common delusion in left hemispatial neglect syndromes).

In summary, it would appear that the research and clinical literature recognizes three basic types of delusional presentations—psychotic delusions, stereotypic delusions accompanying specific neurological disorders, and nonbizarre delusions that constitute a psychotic spectrum delusional disorder.[7]

Dr. Roman then spent seven paragraphs (and almost an entire page of his eight and a half page report) discussing and analyzing petitioner's responses to a variety of items presented to petitioner from the Peters *Delusions Inventory*.[8]

Dr. Roman's report then turns to the petitioner's allegedly delusional belief system:

> Applying Junginger's methodology of defining the context of a delusion belief via "Who? What? Where? When? How? And Why?" provided evidence of the extent and intractability of Mr. Wood's persecutory delusions.
>
> Mr. Wood is very specific about the Who involved in his case. In fact, he presents two people within the framework, the first being the assistant district attorney who prosecuted him and the other being the trial judge.
>
> Regarding the *What*, Mr. Wood states that it is corruption within the system and the existence of a grudge these people hold against him that causes their desire to persecute him. He states that he is unsure about the reasons they would have a grudge but suspects that it is related to the fact that he was never caught for some of the more minor crimes he committed in his youth. He maintains that both the judge and the assistant district attorney know that he is innocent and that, in fact, they prevented information from getting before the jury so that they could obtain a conviction and secure a death penalty sentence. He maintains that this pursuit of a conviction resulted in an unfair trial—a fact that he believes is indisputable because "several" other judges have told him that he did not get a fair trial. The question of *Where* is perhaps less germane to understanding Mr. Wood's delusional system except to the extent

7. Report of Dr. Michael A. Roman, dated September 21.2009, attached as Petitioner's Exhibit 1, to Petitioner's Supplement to Petition for Writ of Habeas Corpus, filed September 30, 2009, docket entry no. 83, at pp. 5–6.

8. *Id.*, at pp. 6–7.

that he declares the Texas judicial system to be specifically corrupt, even citing Supreme Court Justice Ginsburg as being in agreement with him based on comments he believes she has made regarding the unfairness of Texas justice in capital cases. In this respect, he seems to think that this would not be happening to him if he were not a resident of Texas.

*When* also lacks specificity in this case. Interpreted as a point in time, it is Mr. Wood's apparent belief that he became a target as soon as the Kerrville district attorney allowed his female assistant latitude in trying the case. He further maintains that his conviction will be immediately overturned immediately upon presenting "the right amount" of money to the judge, so long as the judge has "no fear that he is being set up." Alternatively, he believes that he could secure a reversal of his conviction via a new trial if the county judge that replaced the prior judge would review the facts in the case. He adds, however, that he worries about being released even with a new trial if he is unable to offer a reasonably large bribe to the judge.

This also speaks to the question of *How*, in terms of how such a persecution could happen. Mr. Wood believes that he became a target because the judge, who he points out works for the State, is biased against criminals and not judicially impartial. He adds that the fact that they could not prosecute him for previous lesser crimes he committed increased their desire to convict him for this crime which he maintains he did not commit. He also has a firm and unambiguous, albeit convoluted, response to *How* he can prevail in his case. Mr. Wood maintains that only a bribe of sufficient magnitude or intervention of the fraternal order of the freemasons, will work to extricate him from his situation. He

was insistent that his freemason story not be repeated because he fears for his safety in the event they should learn that he has knowledge of their power to intervene. He states that he knows of at least one other death row case that was resolved by the intervention of the freemasons and he fears the potential ramifications of making this known to others. He claims that "he knows for a fact" that the trial judge and district attorney are masons and that only a direct intervention by their brethren (or a sufficiently large and safely delivered bribe) would lead them to be willing to take the risk of exposing their previous wrongdoing in convicting him by reversing his conviction and providing a new trial. This delusion is perhaps the most classic delusional belief that he holds in that it contains both strong paranoid and persecutory features, along with magical thinking.

The final question of *Why* was more difficult for Mr. Wood to answer when asked directly. He stated he did not know why this is happening, adding that he wishes someone could explain it to him. However, in his spontaneous discourse on the subject, he clearly explains the *Why*. Specifically, he believes that the desire for money and power have driven the conspiracy against him. He argues that the assistant district attorney wanted to make a name for herself by getting convictions on major cases so that she could advance and ultimately earn more money. Her boss, the district attorney, is said to have let her do what she wants to do. This combination of monetarily driven ambition, lack of oversight, and a corrupt judicial system, in Mr. Wood's opinion, is the main cause of his current predicament. He adds that justice has nothing to do with the proceedings.

*Clinical Impressions:* The results of the current evaluation indicate that Mr. Wood scores below average on many cognitive measures, including formal intelligence testing. His ability to use language in service to higher order purposes, such as required on measures of verbal reasoning, was his poorest ability. Overall, there was no evidence of any specific neurobehavioral disorder or major cognitive dysfunction. The results obtained are consistent with prior evaluations which have demonstrated his overall cognitive ability to fall below average for age. These results are also consistent with his history of learning disability.

On interview, Mr. Wood continues to give strong evidence of narcissistic thinking. He seems to overvalue his self-worth, particularly regarding his relationship to the opposite sex, considering himself quite a ladies' man and quite capable of evaluating the sexual motives of women. He demonstrates less paranoia than had previously been the case, but still manifests paranoid thinking in relation to his legal situation.

Mr. Wood demonstrates clear evidence of a Delusional Disorder as defined by the DSM–IV–TR. His delusions are nonbizarre and are not due to the effects of drugs or another physiological disorder. Of the three types of delusional disorder categories that exists—psychotic delusions, delusional misidentification syndromes, and nonbizarre delusions within the context of a Delusional Disorder—Mr. Wood clearly manifests the last of these. His delusional system is persecutorial in nature and is particularly well formed around his legal situation. It is worth stating once again that neither additional psychotic symptoms—such as other positive symptoms (including hallucinations) or negative symptoms (such as affective flattening) of schizophrenia [sic]—nor neurological impairments are required to be present for a Delusional Disorder to be diagnosed. In fact, the presence of either of these conditions would eliminate consideration of the diagnosis of Delusional Disorder and make his delusional system a simple byproduct of a primary pathology.

It does not appear that Mr. Wood is capable of rational thinking regarding his sentence and pending execution. He firmly maintains, as he has since his arrest, that he is not guilty of the crimes for which he has been convicted. He maintains that any jury would see this if they were allowed to hear the testimony that he believes was excluded during the trial. He firmly states that he believes his execution has no relationship to the death of the victim in the case, but is rather the product of the aforementioned corrupt system. He added that he believed there was a "99.9% chance that they're going to kill me." Mr. Wood strongly believes that his inability to raise the money to bribe the judge is the main reason that he will not prevail. Because of his strongly entrenched delusional belief system, Mr. Wood appears incapable of linking his execution with the robbery and murder that was committed.

Axis I: 297.1 Delusional Disorder, Persecutory Type

314.01 Attention Deficit Hyperactivity Disorder, Combined Type

312.8 Conduct Disorder Adolescent–Onset Type

Axis II: Narcissistic Personalty Disorder features Paranoid Personality Disorder features

Axis III: Noncontributory

Axis IV: Problems related to legal system, family, socialization, housing, and access

Axis V: Current GAP: 30 [9]

### b. *The Report of Respondent's Mental Health Expert*

Respondent filed his response to petitioner's supplemental amended petition on January 19, 2010, along with a copy of a July 30, 2009 report from Dr. Mary Alice Conroy in which she concluded (1) petitioner fully understands the reason he is to be executed, (2) petitioner's insistence that he should not be held legally responsible for the murder of Keeran despite petitioner's involvement in the robbery (because petitioner did not himself pull the trigger) does not constitute a "delusion" or a form of mental illness, (3) petitioner possesses an anti-social personality but no significant intellectual deficiency, and (4) while petitioner is depressed, his depressive symptoms do not prevent petitioner from understanding the reason he is to be executed. *Docket entry no. 86.*

More specifically, after noting that petitioner (1) had been diagnosed with Antisocial Personality Disorder, (2) was not diagnosed by Dr. Roman or any other mental health professional in the 1996–97 time frame as suffering from any mental illness that could be linked to Dr. Roman's contemporaneous finding that petitioner was then experiencing "delusional thinking," and (3) had never been diagnosed with a mental illness, Dr. Conroy found, concluded, and opined as follows:

### Case Formulation:

Mr. Wood experiences periods of depression which he describes as "feeling down". He is also quite anxious at times. Mr. Wood understand he is facing execution by the state of Texas. At one point, Mr. Wood was four hours away from being executed when he received a stay of execution. He feels persecuted by the state of Texas. He feels, accurately, that the state of Texas wants to kill him. Mr. Wood expresses extreme frustration regarding certain matters of his case and his appeals that he discusses in great detail. Depressive symptoms are not surprising under such circumstances. There is no evidence the defendant has ever experience [sic] a major depressive episode. Mr. Wood mentioned his lack of intelligence several times in the evaluation. One test of cognitive functioning administered at age twelve yielded an IQ score falling in the upper limits of the Low Average range of intelligence. A separate test of cognitive functioning at age 15 yielded an IQ score of 85 (also in the Low Average range). Mr. Wood was administered a complete battery of neuropsychological tests following his arrest. This testing once again confirms low average intelligence. During the current evaluation, Mr. Wood evidence an ability to discuss complex legal aspects of his case, trials, and appeals. Overall, there is no evidence the defendant is a person with mental retardation or any other severe intellectual impairment.

Mr. Wood has used a variety of illegal substances. His first time to drink alcohol was in grade school. During high school, he used and experimented with several drugs including: marijuana, PCP, methamphetamine and cocaine. Records indicate that he has described a history of significant substance abuse prior to his incarceration to numerous evaluators.

In reviewing Jeffery Wood's history, it appears that the only area of concern regarding his competence has been that he has some type of delusion about his current offense. However, he has never been given a psychotic diagnosis by any-

9. *Id.,* at pp. 7–9.

one, nor has any previous diagnosis been one that includes delusional thinking. At various times evaluators have said that he believes he is completely innocent, that he can do no wrong, that he will surely be exonerated. However, during the current evaluation, he said quite clearly that he is "no saint" and that he had been involved in criminal activity over the years. He did not claim complete innocence for the current offense. Rather, he argued that he was outside at the time of the robbery and was not the trigger man (apparently accurate). Therefore, he believes he should not be held responsible for the murder. He added that the Texas legislature should amend the law accordingly. He also proffered several other arguments as to why he is less culpable (e.g., his co-defendants had talked about the robbery scheme, but he really didn't believe them; his co-defendants had threatened his family if he did not go along with them). Although there is no way to assess the accuracy of these statements, they are not delusional. As opposed to a certainty that he will be exonerated, during the current evaluation, he said he had little hope for a reversal. Rather, he expressed the sobering idea that, unless there were to be something very favorable in a mental health evaluation, he would likely "get a date." Overall, there was no evidence that this defendant has delusions and no evidence of a serious mental illness for which delusions would be a symptom.

Mr. Wood's history also indicates the presence of a personality disorder. Unlike a mental illness, a personality disorder is a chronic constellation of traits that tend to be maladaptive. Records indicate a general disregard for the rules and mores of the larger society. There is a strong tendency to externalize blame for his difficulties (e.g., his parents were abusive and neglectful, his lawyers did not present a strong enough case, the medical staff at North Texas State Hospital failed to treat him appropriately). He tends to be emotionally labile and engages in self harm behaviors when frustrated.

### Diagnosis:

Axis I: 304.80 Polysubstance Abuse

    311 Depressive Disorder NOS

Axis II: 301.9 Personality Disorder NOS

### Areas of Competency:

**Understanding that he is to be executed and that the execution is imminent:** Mr. Wood discussed in great detail his thoughts and beliefs regarding death. He also stated, "If y'all say nothing is wrong with me, I'll get a date" for execution. Mr. Wood stated "I don't want to die". He also expressed a desire to have his sentenced [sic] changed to life (even though he described that as bad also because he would like to start a new life with his wife in Norway). Mr. Wood described himself as a "Christian" and stated he has forgiven the DA and the evaluators. When asked to describe what happens after death, Mr. Wood replied, "Some people say you still face judgment [but] no one knows. When you're dead, you're dead". He stated that "I only fear the Lord, not death". He told evaluators that on his first trip to be executed (prior to receiving his stay of execution) he was singing and joking with the guards. He explained that he wasn't going to become violent and hurt anyone and that, instead, he wanted to walk to his death with his "head held high like a man" so that the state could not say "I told you so". When asked if the state wanted him to look crazy, he replied, "the state wants me to look smart". Mr. Wood also ex-

plained how the state couldn't execute someone who was mentally retarded (with an IQ of "70 or so") and described himself as "dumber than hell".

**Understanding of the reason he is to be executed:** Mr. Wood understands that he is to be executed because of his involvement in a robbery/murder. He stated that he did not feel that he should be held responsible since he did not personally shoot anyone and was forced at gunpoint and under threat to his family members to participate. In his description of his opinion of his innocence, Mr. Wood demonstrated a detailed understanding of the proceedings against him and the specific incident that brought about his impending punishment. He expressed a strong desire for his lawyer to make it known that the victim's own family had stated they do not wish Mr. Wood to be executed. He reported the state of Texas thinks he was the "mastermind" behind the crime.

**Opinion on Competence for Execution:** Based on the information provided, it is our professional opinion that Jeffery Lee Wood is currently competent to be executed. He is aware that he is to be executed by the state of Texas, that the execution is imminent, and he possesses an accurate understanding of the reason for his execution.[10]

## 3. Voluminous Record Submissions

In advance of the evidentiary hearing held November 16–17, 2010, the parties furnished this Court with voluminous records, including more than seven hours of unindexed recordings of conversations between petitioner and his family members in August, 2008, more than six hundred pages of petitioner's medical and mental

health records from the TDCJ and UTMB, more than eleven hundred pages of petitioner's correspondence, and more than six hundred pages of records from petitioner's state trial court proceedings, including copies of petitioner's school and medical and mental health records. A brief summary of those voluminous documents will furnish some context for the testimony this Court heard on November 16–17, 2010.

### a. Petitioner's August, 2008 Conversations

Respondent presented this Court with recordings of more than seven hours of unlabeled, unindexed, conversations between petitioner and his family members apparently recorded in August, 2008, on the eve of petitioner's previously scheduled execution. This Court reviewed those recordings (most of which consisted of largely aimless conversations about mundane topics such as the choices of snack foods petitioner and his family members wished to make from the TDCJ commissary and vending machines) in their entirety and furnished the parties with a detailed summary of the contents of same in an Order issued September 30, 2010, *docket entry no. 118.* In pertinent part, this Court summarized those recordings for the benefit of the parties and their experts as follows:

#### (1) Disc # 40 (Sides A & B)

Respondent's exhibits 5(a) and 5(b) [both marked as "Disc # 40"] consist of a slightly duplicitous pair of recordings of conversations petitioner and his wife had on August 11, 2008. Side A of this recording runs approximately 80 minutes. Side B runs approximately 63 minutes. Because of the duplication of

---

**10.** Report of Dr. Mary Alice Conroy and Darrel B. Turner, dated July 20, 2009, attached as Director's Exhibit to Respondent's Response to Petitioner's Supplement to Petition for Writ of Habeas Corpus, filed January 19, 2010, docket entry no. 86, at pp. 5–7.

the final portion of "Side A" at the beginning of "Side B," it is difficult to determine the total running time of this recording. There is very little in these banal conversations that even touches on the issues properly before this Court. At approximately the 23 minute mark of Side A, there is about a three-minute conversation regarding then-upcoming-executions of other TDCJ inmates which clearly demonstrates petitioner was oriented to both time and space, as well as events going on around him. At approximately the 38 minute mark of Side A, there are a series of conversations over the following twelve minutes which once again show petitioner had a comprehensive understanding of the clemency proceedings then-underway on his behalf. At approximately the 64 minute mark of Side A of Disc # 40, i.e., respondent's exhibit 5(a), the petitioner and his wife discuss for approximately five minutes the fact petitioner was offered a life sentence prior to his capital murder trial. This last conversation of relevance is repeated verbatim as the first five minutes of Side B of Disc # 40, i.e., respondent's exhibit 5(b). This Disc # 40 (both Sides A & B) contains approximately twenty minutes of conversation arguably relevant to the issues in this cause.

(2) *Disc # 79 (Sides A & B)*

Respondent's exhibits 6(a) and 6(b) [marked as "Disc # 79 Side A" and "Disc # 78 Side B"] contain petitioner's conversations with various members of his family on August 18, 2008. Side A, i.e., respondent's exhibit 6(a), runs approximately 63 minutes. At approximately the 38 minute mark of Side A, an eleven minute segment appears wherein petitioner furnishes an elucidating explanation of the case of Kenneth Foster, a convicted capital murderer who, like petitioner was the get-away driver in a series of armed robberies and who received a commutation of his death sentence from the current Texas Governor, Side B, i.e., respondent's exhibit 6(b), runs approximately 63 minutes in length. Side B contains a five minute segment two minutes into the recording in which petitioner again discusses the fact he was not the mastermind of the armed robbery that left Kriss Keeran dead. The final three minutes of Side B contains a brief exchange concerning the Vienna Convention and the possible legal implications of international law on petitioner's case. There is less then seventeen minutes of conversation on Disc 79, both Sides A and Side B, which is even arguably relevant to any issue in this cause.

(3) *Disc 67*

Respondent's exhibit 7 [marked as "Disc # 67"] contains approximately 62 minutes of conversation between petitioner and various members of his family on August 18, 2008. Other than very brief comments of less than thirty seconds each made at the 1 minute and 39 minute marks by petitioner acknowledging that he understood the nature of the clemency proceedings then underway on his behalf, there is nothing on this recording arguably relevant to the issues in this cause. Thus, there is less than a minute of recordings on this disc relevant to any issue in this cause.

(4) *Disc # 37 (Sides A & B)*

Respondent's exhibits 8(a) and 8(b) [marked as "Disc # 37 Side A" and "Disc # 37 Side B"] consist of recordings of petitioner's conversations with petitioner's wife on August 4, 2008. These recordings contain only a single three-minute segment beginning at ap-

proximately the 35 minute mark of Side A, i.e., respondent's exhibit 8(a), in which petitioner argues he was not the mastermind of the armed robbery that left Kriss Keeran fatally shot. Otherwise, these recordings contain absolutely nothing relevant to any issue in this cause. Thus, the two sides of this Disc contain only three minutes of conversation relevant to any issue before this Court in this cause.

At no point in the more than seven hours of recorded conversations with his family members in August, 2008 did petitioner ever mention or allude to any conspiracy between his prosecutor and trial judge to convict petitioner or sentence petitioner to death.[11] Likewise, none of the conversations in question shed any light on the issues before this Court *except* insofar as the few snippets of conversation identified above suggested petitioner possessed a knowledge of (1) Texas criminal, appellate, and state habeas corpus procedure,

(2) several then-recent judicial decisions by the state and federal courts, as well as (3) then-recent developments on a variety of political topics, including the Texas Governor's willingness to commute the death sentence of another Texas death row inmate (Kenneth Eugene Foster) who, like petitioner, drove the get-away vehicle during an armed robbery that turned into a capital murder.[12]

#### b. *Petitioner's TDCJ Medical & Mental Health Records*

Petitioner's TDCJ medical and mental health records, submitted months in advance of the hearing in this cause and admitted into evidence during the evidentiary hearing bearing UTMB page stamps, contain numerous findings and conclusions suggesting petitioner possesses an antisocial personality, is impulsive, manipulative, and refuses to take responsibility for his own actions.[13] At numerous points during his incarceration in the TDCJ, petitioner

---

11. Equally significant, nothing in the recordings from August, 2008 suggests that any member of petitioner's family has ever challenged petitioner's alleged conspiracy theory as inaccurate. This may be due to the fact that nothing which transpired during those seven-plus hours of banal conversation suggested, implied, or even vaguely hinted at the possibility petitioner has ever voiced the conspiracy theory that now underlies his *Panetti* claim herein. What is clear from the recordings, is that petitioner's family members appeared to be very supportive of petitioner's efforts to avoid his death sentence and agreed with petitioner on the unfairness of his death sentence, especially in view of the fact petitioner was once offered (but turned down) a life sentence in exchange for a guilty plea and that one of the three conspirators in the robbery was never charged with a criminal offense. If the tenor of the comments made by petitioner's family members on the recordings in question is any indication, it is extremely doubtful any of petitioner's family members have ever challenged petitioner's "conspiracy theory" or urged petitioner to accept responsibility for his role in Keeran's murder.

There is no credible evidence now before this Court suggesting any person whom petitioner could rationally be expected to trust such as a family member or a close personal friend, has ever confronted petitioner with an argument, much less incontrovertible evidence, suggesting petitioner's conspiracy theory is factually inaccurate.

12. The facts of the Kenneth Eugene Foster case are set out in Judge Royal Furgeson's unpublished opinion for this Court, which appears at 2005 U.S. Dist. LEXIS 13862 (W.D.Tex. March 3, 2005), *CoA denied*, 2006 WL 616980 (5th Cir. March 13, 2006), *cert denied*, 549 U.S. 859, 127 S.Ct. 141, 166 L.Ed.2d 103 (2006); *denial of CoA affirmed but grant of partial habeas relief reversed* 466 F.3d 359 (5th Cir.2006), *cert. denied*, 550 U.S. 906, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007).

13. Petitioner's TDCJ Medical and Mental Health Records, at pp. UTMB 34, 41, 52, 55–56, 65, 73, 75–76, 84–85, 138, 149, 466, 484, 487–88, 497, 505, 508, 515, 538.

has been accused by medical and mental health staff of deliberately feigning mental health issues to gain something he wanted.[14] Petitioner has expressed suicidal ideation and even reported making suicide attempts in June and July, 2000, February, 2001, April, 2003, August, 2004, and January, 2009; although most of these were deemed by mental health staff to be efforts by petitioner to obtain something he wanted rather than sincere expressions of a desire to harm himself.[15]

In November, 2010, on the eve of the evidentiary hearing in this cause, respondent also furnished this Court with an additional 80 pages of petitioner's medical records reflecting petitioner's brief psychiatric hospitalization following an incident on or about August 29 or 30, 2010, in which petitioner placed a homemade noose around his neck, laid on the floor, declared "I'm trying to kill myself," and refused to remove the noose. *Docket entry no. 131.*

Petitioner's TDCJ medical records concerning the incident in question reflect that (1) petitioner was sprayed with chemical agents when he refused to remove the noose, (2) when questioned later, petitioner stated "I had to do it. I had nothing to lose," (3) examination of petitioner immediately after the incident found "no ligature marks, redness or bruising of neck," (4) petitioner also explained his actions as follows: "I came here [to the TDCJ's psychiatric facility] to get some help. I been going around and round with those officers. They keep on screwing me around.

They keep trying to push me over the edge," (5) petitioner explained his dispute with the guards at his facility originated when petitioner had difficulty or refused to "get into single cuffs" and a guard verbally abused petitioner, (6) petitioner's thought processes when interviewed on September 2, 2010 revealed no evidence of delusions, paranoia, or suicidal/homicidal ideation, (7) petitioner was diagnosed on September 2, 2010 with Polysubstance Dependence and Antisocial Personality Disorder, (8) when examined on September 3, 2010, petitioner's thought processes were considered "negative for delusions," (9) petitioner's MMPI–2 RF responses suggested "there were an excessive number of infrequent responses, that a considerably larger than average number of symptoms rarely described by individuals with genuine, severe psychopathology were ` endorsed, that a much larger than average number of somatic symptoms rarely described by individuals with genuine medical problems were endorsed, and that a [sic] *unusual combination of responses that is associated with non-credible reporting of somatic and/or cognitive symptoms* " were present, (10) when interviewed on September 8, 2010, petitioner reported a pattern of agitation he attributed to his family "not following through on their promises," i.e., not visiting him and not sending him letters, birthday cards, and money they had promised to do so, and (11) petitioner's distrust of corrections staff is "quite normal in a correctional setting." [16]

14. *Id.,* at pp. 79, 133, 144, 148, 165, 174, 429, 430, 524.
    In addition, in one incident, petitioner responded inappropriately to psychological testing, thereby, rendering the test results useless. *Id.,* at p. 107.

15. *Id.,* at pp. 131–34, 147–48, 169, 171, 271, 429–30, 524. One such incident occurred in August, 2004, wherein petitioner threatened to harm himself if he were found guilty in a

then-pending disciplinary action. *Id.,* at p. 524. Petitioner's suicidal gestures in July, 2000 were also deemed by the mental health staff to have been feigned for the purpose of getting what petitioner wanted. *Id.,* at pp. 133, 136, 144, 147, 148, 165. Petitioner also apparently threatened suicide in January, 2009 unless his toilet was fixed. *Id.,* at pp. 429–30.

### c. Petitioner's TDCJ Correspondence

This Court has likewise been compelled by the parties to review more than eleven hundred pages of petitioner's correspondence in which petitioner engages in rambling discourses on (1) the efforts of citizens to change Texas law relating to the death penalty,[17] (2) trial errors which allegedly took place during his trial and which he wishes to see pursued in possible future appellate or habeas corpus proceedings,[18] (3) the Texas law of parties and its impact on his trial,[19] (4) the fact Keeran's family is currently supporting his efforts to avoid the death penalty,[20] and (5) what he perceives to be his "innocence" of the offense of capital murder.[21] Petitioner's correspondence also indicates (1) petitioner believed the State wished to test him for "IQ and mental issues," [22] (2) petitioner has a web site to which he has referred those with whom he has corresponded,[23] and (3) petitioner has protested that he is not the monster the State of Texas says he is.[24]

Nothing in any of petitioner's voluminous correspondence suggests petitioner has ever communicated to any of those with whom he has corresponded the beliefs that (1) he is the victim of a malevolent conspiracy between his prosecutor and state trial judge or (2) the Freemasons could help him gain his release from prison or a new trial.

### 4. Evidentiary Hearing

On November 16–17, 2010, this Court heard testimony and received documentary evidence addressing petitioner's *Panetti* claim.[25]

#### a. Initial Testimony of Dr. Michael Roman

Petitioner's mental health expert, Dr. Michael A. Roman, testified on direct examination that he believed petitioner suffers from a delusional belief system which interferes with petitioner's ability to rationally link his crime with the reason he is scheduled to be executed and, therefore, renders petitioner incompetent to be executed.[26]

More specifically, Dr. Roman testified, in pertinent part, that (1) petitioner is delusional,[27] (2) a delusion is "a fixed belief system that persists and is fairly robust even though most people would agree that it's erroneous and there seems to be credible evidence to suggest that there's no reason to believe what you believe. And it's a false belief that persists despite evidence that you shouldn't believe

---

**16.** Petitioner's TDCJ medical records attached to Respondent's Third Motion for Leave to File Respondent's Exhibits Under, filed November 10, 2010, docket entry no. 131, at pp. 17–18, 20–21, 31, 40–43, 63–68, 74–76.

**17.** Petitioner's TDCJ Correspondence, found in Respondent's Exhibit 4 (also Respondent's Exhibit R–4), at p. 239.

**18.** *Id.*, at pp. 244, 607–10.

**19.** *Id.*, at pp. 548, 723.

**20.** *Id.*, at pp. 900–02.

**21.** *Id.*, at pp. 999, 1014–15.

**22.** *Id.*, at pp. 541, 707.

**23.** *Id.*, at pp. 636, 812.

**24.** *Id.*, 678.

**25.** The verbatim transcription of that hearing appears herein as docket entry no. 150.

**26.** Verbatim transcript from Federal Evidentiary Hearing held November 16–17, 2010, docket entry no. 150 (henceforth "FEH Transcript"), testimony of Dr. Michael A. Roman, at pp. 10–22, 24, 26–31, 38–43, 46–49.

**27.** *Id.*, at p. 10.

that," [28] (3) "at the time that you believe it, if there is a preponderance of evidence that you should not believe it, it would still be a delusion at that time even if subsequently it were demonstrated that perhaps there was a reason to believe it," [29] (4) petitioner has realistic perceptions of his execution, i.e., he "certainly understands very clearly that he has been sentenced to death," [30] (5) petitioner understands that he has received an execution date and will receive another date,[31] (6) petitioner has a fully formed delusional belief system surrounding his impending execution,[32] (7) a Delusional Disorder falls in the category of psychotic disorders,[33] (8) petitioner's is a non-bizarre delusional belief system that appears rational on its face and is unrelated to a mental disorder or substance abuse,[34] (9) a true Delusional Disorder requires the absence of most of the tenets of psychosis,[35] (10) petitioner suffers from a persecutorial delusional disorder,[36] (11) petitioner's delusional belief system focuses on the assistant district attorney who prosecuted his case and the trial judge who presided over petitioner's trial,[37] (12) there is no credible evidence petitioner has ever expressed to anyone other than his own counsel and mental health expert in this case the belief that he is being persecuted by the Freemasons,[38](13) petitioner had a delusional belief system in 1996,[39] (14) petitioner is incompetent to be executed because he has irrational beliefs regarding why he is to receive the death penalty, i.e., he believes he is receiving the death penalty because his prosecutor and the trial judge, for the purpose of furthering their own careers, conspired to find petitioner guilty of the crime of capital murder because they could not prosecute petitioner for other, minor crimes—as a way of getting even with petitioner,[40](14) the Freemasons are not part of petitioner's delusional belief system—rather, petitioner believes they could intervene to help him avoid the death penalty,[41] (15) if petitioner were simply unwilling to accept the reasons for his fate, it would not meet the criteria for the diagnosis Dr. Roman has made,[42] (16) it is difficult for lay people to understand the nature of a closely-held delusional belief system because "it defies common sense," [43] (17) petitioner's delusions should appear to others to be "absurd," "outrageous," and to defy common sense, i.e., to be "totally ridiculous and unworthy of belief," [44] (18) to the extent petitioner cannot elucidate the tenets of his delusion, it becomes much more questionable whether it's truly a delusion,[45] (19) petitioner has

28. *Id.*, at p. 11.

29. *Id.*, at p. 11.

30. *Id.*, at p. 12.

31. *Id.*, at p. 13.

32. *Id.*, at p. 14.

33. *Id.*, at p. 15.

34. *Id.*, at p. 16.

35. *Id.*, at pp. 17–18.

36. *Id.*, at p. 19.

37. *Id.*, at pp. 21–22.

38. *Id.*, at p. 24.

39. *Id.*, at p. 26.

40. *Id.*, at pp. 27–28.

41. *Id.*, at p. 28.

42. *Id.*, at pp. 28–29.

43. *Id.*, at p. 30.

44. *Id.*, at p. 38.

45. *Id.*, at p. 39.

an antisocial personality,[46] (20) neither that fact nor petitioner's depressive disorder nor petitioner's narcissistic personality disorder nor petitioner's long-standing diagnosis of over-anxious disorder rules out a diagnosis of Delusional Disorder,[47] and (21) paranoid personality disorder is more extreme than petitioner's persecutory delusional disorder.[48]

On cross-examination, Dr. Roman testified (1) petitioner's delusions are non-bizarre,[49] (2) Dr. Roman evaluated petitioner in 1996–97 in connection with petitioner's two competency trials and did not diagnose petitioner with a delusional disorder at that time but, rather, diagnosed petitioner at that time with paranoid personality disorder,[50] (3) Dr. Roman formed his diagnosis of petitioner's delusional disorder in September, 2009,[51] (4) in 1997 petitioner was quite well versed in the legal system and petitioner's thinking about the legal system has become "more realistic" since then,[52] (5) *in 1997, Dr. Roman testified petitioner understood (a) the crime with which he was charged, (b) that it included the death of the store clerk, and (c) that, if found guilty, petitioner could get life imprisonment or the death penalty,*[53] (6) petitioner told Dr. Roman around the time of trial that petitioner preferred to get the death penalty, as opposed to a sentence of life in prison,[54] (7) petitioner comprehends the concept of getting the death penalty,[55] (8) what petitioner does not appreciate is how he can be put to death when he was not the triggerman,[56](9) petitioner understands the law of parties but is not appreciative of the fact he was convicted of capital murder under the law of parties,[57] (10) petitioner acknowledges his involvement in the robbery,[58] (11) one of the distinguishing features of a delusion is that the person holds on to a belief despite clear contradictory evidence presented to them,[59] (12) Dr. Roman believes others have told petitioner his beliefs about a conspiracy against him are not rational,[60] (13) Dr. Roman sincerely believes petitioner will go to his grave believing petitioner will die because of the delusional belief system, i.e., the conspiracy, and not because of what petitioner did,[61] (14) petitioner places the blame for Keeran's death on Reneau,[62] (15) petitioner's TDCJ medical records include numerous entries suggesting petitioner deliberately was exaggerating his symptoms,[63] and (16) between the date of petitioner's offense in January, 1996 and September, 2009 no one had ever diagnosed petitioner with a psychotic disorder.[64]

46. *Id.,* at pp. 39–40, 47.

47. *Id.,* at pp. 40–41, 43.

48. *Id.,* at pp. 47–48.

49. *Id.,* at p. 50.

50. *Id.,* at pp. 52–54.

51. *Id.,* at p. 51.

52. *Id.,* at pp. 54–56.

53. *Id.,* at p. 57.

54. *Id.,* at p. 57.

55. *Id.,* at pp. 57–58.

56. *Id.,* at p. 58.

57. *Id.,* at p. 58.

58. *Id.,* at p. 59.

59. *Id.,* at pp. 60, 62.

60. *Id.,* at p. 62.

61. *Id.,* at pp. 76–77.

62. *Id.,* at p. 78.

63. *Id.,* at pp. 81–82.

64. *Id.,* at p. 88.

### b. *Testimony of Dr. Shelia Bailey*

A clinical psychologist employed at the TDCJ's mental health unit, Jester 4, who interviewed petitioner in September, 2010, following petitioner's suicidal gesture [65] testified, in pertinent part, that (1) she interacted with petitioner four times during petitioner's stay at the Jester 4 unit and performed a psychosocial evaluation of petitioner,[66] (2) she attempted to administer the MMPI on petitioner but petitioner's responses resulted in four of the six validity scores being elevated, suggesting petitioner was over-reporting symptomology and rendering the profile invalid,[67] (3) one possible explanation of those elevated validity scores is that petitioner was malingering, i.e., exaggerating his symptoms,[68] (4) she found no symptoms of psychosis,[69] (5) petitioner communicated to her on his third day at the Jester 4 facility that (a) he was innocent, (b) he was not the person who committed the murder, and (c) the family of the victim did not want petitioner to be executed,[70] (6) petitioner never mentioned the Freemasons or bribing a judge to her,[71] (7) prisoners often express the view that they are being persecuted by the guards,[72] (8) initially, on September 9, 2010, she diagnosed petitioner with a Delusional Disorder focused on the guards petitioner claimed were harassing him,[73] (9) but, after consulting with a psychiatrist, on September 14, 2010, she updated her findings, re-evaluated, and changed her diagnosis to take into consideration the culture or group in which petitioner resided,[74] (10) *under the DSM–IV, "delusions" do not include beliefs that are shared by other members of the person's culture or group*,[75] (11) petitioner was not exhibiting true persecutorial beliefs about the guards because he showed no fear of the guards,[76] (12) she changed her diagnosis to "impulse control disorder,"[77] (13) no one with the State of Texas asked her to change her diagnosis of evaluation of petitioner,[78] (14) petitioner's distrust of the guards reflected the prison inmates' culture and was perfectly normal for those in a correctional setting in which they had suffered a loss of personal identity and were subject to arbitrary control and dependency,[79] (15) petitioner was treated throughout his stay at Jester 4 in a manner consistent with a diagnosis of a mood disorder, not a psychotic disorder,[80] (16) petitioner understood when he spoke with her that he had been sentenced to death,[81] (17) *petitioner understood why he was going to be executed, he merely disagreed with his being sentenced to death because he did not actually pull the trigger*,[82] and (18) at the

**65.** *See note 16, supra, and accompanying text.*

**66.** FEH Transcript, testimony of Dr. Shelia Bailey, at p. 101.

**67.** *Id.,* at pp. 102–03.

**68.** *Id.,* at p. 103.

**69.** *Id.,* at p. 104.

**70.** *Id.,* at p. 105.

**71.** *Id.,* at pp. 105–06.

**72.** *Id.,* at p. 107.

**73.** *Id.,* at p. 107.

**74.** *Id.,* at pp. 108–09, 114, 126.

**75.** *Id.,* at pp. 108–09, 126.

**76.** *Id.,* at p. 109.

**77.** *Id.,* at p. 109.

**78.** *Id.,* at p. 110.

**79.** *Id.,* at pp. 115–16.

**80.** *Id.,* at pp. 124–25.

**81.** *Id.,* at p. 134.

**82.** *Id.,* at p. 134.

time she changed her diagnosis, she was unaware any other person had ever diagnosed petitioner with a delusional disorder.[83]

c. *Testimony of Dr. Marv Alice Conroy*

Respondent's chief expert, forensic psychologist Dr. Mary Alice Conroy, testified in pertinent part that (1) she has more than twenty years of experience in forensic psychology working in the Federal Bureau of Prisons and serving as Director of Forensic Psychology at three different federal hospitals,[84] (2) she has done many evaluations of individuals for competency to stand trial and has also been involved in five or six proceedings to determine competency to be executed, including the *Panetti* case in which she testified for the petitioner,[85] (3) "I don't believe that Jeffery Lee Wood has any delusions," [86] (4) "A delusion is something very particular. A delusion is a fixed false belief that the person holds regardless of clear and incontrovertible evidence to the contrary," [87] and (5) "I think the DSM is rather clear in their glossary definition, that there is obvious proof and incontrovertible evidence to the contrary of whatever the belief is." [88]

In her testimony, Dr. Conroy presented this Court with not only a very different understanding of the concept of a "delusion" than that proffered by Dr. Roman but a significantly different approach to determining whether petitioner possesses a delusional belief system than had Dr. Roman during his testimony. In both his written report [89] and his initial testimony before this Court,[90] Dr. Roman emphasized petitioner's responses to the Peters *Delusions Inventory* as supporting his opinion that petitioner suffered from a Delusional Disorder. Likewise, Dr. Roman's written report and initial testimony before this Court omitted any reference to the provisions of the DSM–IV–TR urging consideration of an individual's cultural and religious background in evaluating the possible presence of Delusional Disorder.[91] In stark contrast, Dr. Conroy testified as follows:

Q. Let me rephrase. Is a delusion typically self-serving? Does it typically assist the individual?

A. Not usually, no. In fact, their behavior, one of the things you look at to distinguish between a true delusion and,

83. *Id.,* at p. 137.

84. FEH Transcript, testimony of Dr. Mary Alice Conroy, at p. 138.

85. *Id.,* at p. 139.

86. *Id.,* at p. 143.

87. *Id.,* at p. 143.

88. *Id.,* at p. 144.

89. Report of Dr. Michael A. Roman, attached as Petitioner's Exhibit 1 to Petitioner's Supplement to Petition for Writ of Habeas Corpus, filed September 30, 2009, docket entry no. 83, at pp. 6–7.

90. FEH Transcript, testimony of Dr. Michael Roman, at pp. 71–74.

91. The DSM–IV–TR emphasizes the importance of evaluating suspected delusions within the context of an individual's culture and subculture:

An individual's cultural and religious background must be taken into account in evaluating the possible presence of Delusional Disorder. Some cultures have widely held and culturally sanctioned beliefs that might be considered delusional in other cultures. The content of delusions also varies in different cultures and subcultures. Delusional Disorder, jealous Type, is probably more common in men than in women, but there appears to be no major gender difference in the overall frequency of Delusional Disorder.
**American Psychiatric Association,** *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM–IV–TR) (2000), 297.1, at p. 326.

for example, something that's malingered, feigned, made up at the last minute, is something that, you know, has this person been behaving in some way in concert with that delusion. It doesn't mean he looks psychotic. He certainly doesn't. But has he been behaving in some way in concert with that delusion that is making no sense for him, other than the fact that he believes in this delusion.

Q. Now, you've reviewed—the records that you've reviewed, have you seen any diagnosis of a psychotic disorder for Mr. Wood?

A. Other than the delusional disorder diagnosis, no.

Q. And that's the delusional diagnosis that was determined by Doctor Roman, correct?

A. Yes, that's correct.

Q. Do you agree with that diagnosis?

A. No, I do not.

Q. Can you give some explanation about why you do not agree with that diagnosis?

A. Yes, because a delusion is, like I say, something—a false belief for which there is obvious and incontrovertible evidence to the contrary. It's not simply somebody being wrong about something. It's not simply somebody being mistaken about something. It's not simply somebody rationalizing something. It is something that virtually could not be true and is not helping this person. It's not in their self interest. And yet they believe it regardless of anything. And I saw nothing in Mr. Wood that was that kind of issue. In fact, when he talked to me about his crime, he certainly talked about being innocent but his explanation was one that we've heard over and over in this courtroom today; I didn't actually pull the trigger, I was not actually in the convenience store; therefore, I should not be convicted of murder and executed. Which is very rational. I mean, that's rational understanding. Not in conjunction with Texas law, but, I mean, it is rational understanding.

Q. And do you think a rational individual could believe that he should not be executed for the crime that he has committed?

A. Oh, many rational individuals believe that.

Q. And with respect to the specific delusions, you talked about one, or delusions, beliefs that may or may not be correct here. The fact that he says that the state of Texas is out to get him, is that a delusional belief?

A. Well, if it's a delusional belief, we have many, many deluded people on death row. And as far as that goes, in maximum security prisons. Because it's very typical for people in those settings, and I worked in a maximum security male institution for many, many years, to say that the state, the federal government are out to get them.

Q. And I think you preempted my question, but you interacted with thousands of individuals while at the federal prison?

A. Yes.

Q. And did many of them believe that the state or the government was out to get them?

A. Yes.

Q. Are those individuals delusional as a result of that belief necessarily?

A. I have never called anyone delusional simply because of that single belief, no.

THE COURT: I didn't hear you, Doctor. What did you say?

THE WITNESS: I said I had never called anyone delusional just because of that single, very common belief.

THE COURT: That the government is against them?

THE WITNESS: Right.

THE COURT: Okay. All right.

Q. (BY MR. OTTOWAY) And, in fact, I believe in your report you stated that the state is accurately attempting to get Mr. Wood, as he stated.

A. Well, the state of Texas, it's my understanding at least, that I would say, and maybe I'm deluded, but I would say they're attempting to execute him.

Q. And a couple of other indicators, I guess, of delusions. One of them was that the judge was a Freemason. Is that necessarily a delusional belief?

A. I have no idea if this judge is a Freemason or not. There are a lot of Freemasons in the world.

Q. And so there's no proof that he is a Mason or he's not a Mason?

A. I simply don't know. I don't know anything about this person.

Q. Do many individuals in prison believe that the justice system is corrupt?

A. Yes.

Q. Do many individuals in a prison system believe that judges will take bribes?

A. It wouldn't surprise me, but I don't know that. I mean, I can't say for sure.

Q. Well, unfortunately, in some instances judges have taken bribes, correct?

A. Yes, sir. Several have been on my caseload, in fact.

Q. Now is it a delusional belief to believe that the justice system is corrupt or a judge will accept a bribe?

A. I wouldn't call it a delusion. What I would call it is grabbing at straws. I mean, if you can't think of any other reason that you've been convicted when you know that you did what they said you did, then I guess one way of interpreting it, rationalizing it, is to say, well, it's just that corrupt system and if I just had enough money I could bribe that judge.

Q. So you believe that he is rationalizing or trying to attempt to place blame on others instead of accepting his own guilt?

A. That was very much his tack when he talked with me, and he did not say much about bribing judges.

Q. And how many times did he mention Freemasons?

A. Once.

Q. If he had that deeply-held delusion, do you think that would have been as infrequent as it was?

A. People who have serious delusions that are not treated, are not medicated or not being treated for them, typically it kind of consumes their lives, you know, this is something that—particularly when they have an audience that's willing to listen to them, they talk about it in great detail. Now, Mr. Wood talked about is [sic] case, but he talked about many other things and concerns regarding his case.

Q. And so you looked through all of the medical records and did you see—I may have already asked this, but let me make sure—any other psychotic disorders, besides the one that he has been presently diagnosed with by Doctor Roman?

A. Any specific psychotic disorder mentioned? No.

Q. No. Okay. Do you believe he has any sort of psychotic disorders besides delusional disorder?

A. I see no evidence of a psychotic disorder.

Q. And now, I believe in one of the letters he called himself incompetent. I believe that was a question by Mr. Nichols [sic]. If that is accurately in the letter, would an individual who was incompetent typically recognize his incompetency?

A. All I can say is in my 30 years experience, that would be very unusual.[92]

Dr. Conroy testified she listened to the snippets of recorded conversation identified in this Court's pretrial Order and found nothing delusional about petitioner in his conversations.[93]

She also took exception to Dr. Roman's reliance on the *Peters Delusions Inventory* as a diagnostic tool for evaluating petitioner for a mental illness:

Q. Can you tell us exactly what the Peters Delusion Inventory is?

A. Peters Delusion Inventory was developed in England initially by Emmanuelle Peters and her colleagues, and it was not developed in any way was [sic] a diagnostic instrument to diagnose a delusional disorder. What the Peters inventory was developed about was to see if there was something that that particular group called delusions that was common thinking in the normal population. Not people with any kind of psychosis, not people in a psychiatric hospital, not people with a mental illness, but in the normal population. In other words, people with no mental illness. And I think the word delusion is unfortunate because it doesn't—the way the Peters people used delusion is not the way the DSM uses delusion.

But what they did was they came up with, I think there are 21, if I'm not mistaken, statements that they tested in the normal population that they call delusional statements. And many of those statements were so commonly endorsed that they were endorsed by 75 percent of the normal population. For example, the statement: Some people are not always what they seem. In their initial validation, 75 percent of normal endorsed that. Therefore, I would seriously question the use of the word delusion at all.

And again, the scale is not designed to measure a delusional disorder. It's designed to measure sort of these beliefs that people have in the normal population.

Q. So, in your opinion, using the Peters scale to diagnose a delusional disorder would be inappropriate use of that tool?

A. Yes, I do.

Q. And so, for example, I believe one of the questions is do you feel close to God. Is that a delusional belief in the sense of the DSM IV?

A. If that's a delusional belief, we have a lot of deluded clergy in this country. And we certainly—if you want to look, for example, at the DSM IV diagnosis, there certainly isn't obvious proof or incontrovertible evidence to the contrary. I mean, how would I know if you're close to God or not? [94]

Dr. Conroy also explained her rationale for concluding petitioner's so-called belief system reflects petitioner's personality disorder, i.e., antisocial personality disorder, rather than a "delusional disorder" within the meaning of the DSM–IV–TR:

Q. And I believe part of your opinion or your report, you said, "Mr. Wood's

---

**92.** FEH Transcript, testimony of Dr. Mary Alice Conroy, at pp. 145–50.

**93.** *Id.*, at p. 151.

**94.** FEH Transcript, testimony of Dr. Mary Alice Conroy, at pp. 153–54.

history also indicates the presence of a personality disorder." How is a personality disorder different from a psychotic disorder?

A. A personality disorder is a constellation of personality traits that are on the high end of the bell-shaped curve, so to speak. For example, if you want to say antisocial personality disorder. Most of us probably have some antisocial traits. Most of us are not perfectly nice to everybody at all times. Most of us aren't perfectly empathetic to people at all times. Some of us probably lie a little bit. Some people do that to an extreme. And the idea of a personality disorder is they're kind of a bell-shaped curve, and some people do things at an extreme end. But their personality traits and—Scott Lilienfeld says—and I really like this statement—this is signs and symptoms absent etiology and pathology. And what he means by that is we really don't have any evidence in a personality disorder that there's anything that is not a matter of the person's choice; whereas if you're talking about delusional beliefs or you're talking about psychosis or you're talking about severe mood disorders, you know, we would say medically those aren't the person's choice.

Q. And so do you think that a personality disorder could explain Mr. Wood's refusal to accept responsibility in this case?

A. That would be one of the traits in several personality disorders.

Q. And blaming a corrupt legal system?

A. That would also be fitting with the personality disorder.

Q. And then just denial of the consequences as well as his actions?

A. That they shouldn't be there? Yes.

Q. Now, based on your analysis of the record and then also your interview, do you believe that Mr. Wood knows he committed the crime for which he's on death row for?

A. Yes. And I think he told me that very clearly.

Q. And how did he tell you that?

A. He said, and he discussed this at great length. He said that when this crime happened, which was that this person in the store was killed, shot, that he was outside in the car at the time. I think he said scratching off lottery tickets. But he was out there. And then he drove the car away from the scene. He was very clear that he did not fire the gun, that he was not the trigger person, that he was not even physically present in the building when the killing happened. And as far as I know, from the facts of the case, at least as I read them, that is accurate. And his contention—and he knows that under Texas law, as it is now, because he's talked about wouldn't it be great if we could get this changed. Under Texas law as it is now, he can be convicted for murder. He thinks that, however, is very wrong and irrational.

Q. But ultimately he understands that he has been convicted of a crime for which he is death eligible?

A. Yes. And he understands that, he understands what the law is, and he disagrees with that law.

Q. Does Mr. Wood, in your opinion, based on the records and your interview, does he understand that he is going to be executed and that execution is somewhat imminent?

A. Yes. And we talked about that in some detail, too. We talked about what death is, what happens after death. He said, "Well, there's probably a final judgment, but nobody knows for sure.

Nobody knows for sure if there's a heaven and hell. Probably a judgment, but I don't know for sure. Anyway, what I do know is when you're dead, you're dead."

And he also knew that he had been on death watch before; that he had a date before, and that he was actually within four hours of being executed before the stay came down. And he was also aware that, you know, depending upon, you know, when he went to the Wall's [Unit], there would be a final meal.

Q. And so he doesn't have any sort of a belief that he's going to live after the cocktail of drugs enters his system?

A. No, he doesn't. And, in fact, what he said to me when this evaluation commenced was, "This is my last chance. If my mental health evaluations say I'm fine, then I'm going to get a date and I'm going to die."

Q. And based on your interview, do you believe that Mr. Wood has a rational understanding or connection between his crime and his imminent execution?

A. Yes. I think he knows exactly that that is why he's being executed. He simply doesn't agree with it.

MR. OTTOWAY: May I have one moment, Your Honor?

THE COURT: Of course.

Q. (BY MR. OTTOWAY) Now, for the sake of argument, even if we were to accept every delusion that he has, or what are termed as delusions, do you think that that would affect his rational understanding between his crime and his imminent execution?

A. Probably not because, I mean, the connection between whether he thought his judge was corrupt, whether he thought the D.A. was out to get him really doesn't have anything to do with whether he understands that a jury convicted him of murder and that it's for that murder that he is being executed, despite the fact he was not physically present in the building at the time.

Q. And so ultimately, Doctor Conroy, he has factual knowledge of the crime and of his imminent execution, and he has a rational connection between the two?

A. In my opinion, yes.[95]

On cross-examination, Dr. Conroy testified, in pertinent part, that (1) the idea of judicial corruption is not unusual among inmates in a maximum security setting: "You see the idea that people think the judges are all corrupt as a common idea in that culture." [96] and (2) petitioner's profession of a belief in a conspiracy to execute him is very self-serving and rational in that it excuses petitioner's criminal conduct but it is not malingering.[97] Dr. Conroy also explained her view on the *distinction* between a delusion and a simple, mistaken, self-serving, belief:

What I think you're being confused about here is there's a difference between somebody believing something, which may not be accurate, and it being a delusion. We can all make mistakes in our beliefs. We can all believe things. Especially if they're self-serving. Especially if it's something that's going to make me feel better about myself to believe that the dean just doesn't like women, it's not because I'm not competent. Even though that may be wrong, it's not a delusion; it's simply a self-serving belief.[98]

95. *Id.,* at pp. 154–58.

96. *Id.,* at pp. 170–71.

97. *Id.,* at pp. 172–73.

98. *Id.,* at pp. 180–81.

#### d. *The Return of Dr. Roman*

Dr. Roman returned to the stand on November 17, 2011 and testified, in pertinent part, that (1) he disagreed with Dr. Conroy that petitioner possesses a rational understand of the reason for petitioner's impending execution,[99] (2) he believed petitioner's conspiracy theory constitutes a delusion,[100] (3) he agreed with Dr. Conroy that the Peters Delusion Inventory is a not a proper diagnostic tool for evaluating delusional disorder but nonetheless believed it was an appropriate tool to gather "verifiable and objective" data,[101] and (4) he still holds to his opinion that petitioner suffers from a persecutorial delusional disorder that petitioner's execution will be the result of a conspiracy between state actors.[102]

On cross-examination, Dr. Roman (1) admitted the DSM–IV–TR states that a belief that is characterized as a delusion is not one ordinarily accepted by other members of the person's culture or Subculture,[103] (2) there is nothing in petitioner's medical or mental health records suggesting petitioner had ever been diagnosed with a delusional disorder prior to September, 2009,[104] and (3) he did not diagnose petitioner with a delusional disorder in 1996–97.[105]

#### 5. *Final Briefing*

On April 29, 2011, the parties filed their respective "post-hearing briefs" and identified *for the first time in intelligible fashion,* their views as to where in the voluminous record now before this Court there exists evidence relevant and material to petitioner's claims herein. *Docket entry nos. 151 and 152.*

### II. *The Governing Constitutional Standard*

The Constitution places a substantive restriction on the State's power to take the life of an insane prisoner. *Panetti v. Quarterman,* 551 U.S. 930, 957, 127 S.Ct. 2842, 2860, 168 L.Ed.2d 662 (2007); *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986). The Supreme Court has identified a wide range of rationales for prohibiting the execution of insane prisoners, including recognition that (1) execution of an insane person simply offends humanity, (2) such executions provide no example to others, (3) such executions uncharitably dispatch an offender into another world when he is not of a capacity to fit himself for it, (4) "madness is its own punishment," and (5) executing an insane person serves no retributive purpose. *Panetti,* 551 U.S. at 958, 127 S.Ct. at 2861; *Ford,* 477 U.S. at 406–08, 106 S.Ct. at 2600–01.

> Considering the last—whether retribution is served—it might be said that capital punishment is imposed because it has the potential to make the offender recognize at last the gravity of his crime and to allow the community as a whole, including the surviving family and friends of the victim, to affirm its own judgment that the culpability of the prisoner is so serious that the ultimate penalty must be sought and imposed. The potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called

---

99. FEH Transcript, testimony of Dr. Michael A. Roman, at p. 183.

100. *Id.,* at p. 188.

101. *Id.,* at pp. 200–03.

102. *Id.,* at p. 203.

103. *Id.,* at pp. 206–07.

104. *Id.,* at pp. 209–10.

105. *Id.,* at pp. 211–12.

in question, however, if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole. *Panetti*, 551 U.S. at 958–959, 127 S.Ct. at 2861.

■■■ "Once a prisoner seeking a stay of execution has made a 'substantial threshold showing of insanity,' the procedure afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Panetti v. Quarterman,* 551 U.S. at 949, 127 S.Ct. at 2856; *Ford v. Wainwright,* 477 U.S. at 426, 106 S.Ct. at 2610 (Powell, J. concurring). "This protection means a prisoner must be accorded an 'opportunity to be heard,' though a 'constitutionally acceptable procedure may be far less formal than a trial.'" *Panetti,* 551 U.S. at 949, 127 S.Ct. at 2856; *Ford,* 477 U.S. at 426, 106 S.Ct. at 2610 (Powell, J. concurring). The basic requirements required by due process include an opportunity to submit evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. *Panetti,* 551 U.S. at 950–52, 127 S.Ct. at 2856–58; *Ford,* 477 U.S. at 427, 106 S.Ct. at 2610 (Powell, Jr. concurring). A petitioner is entitled to these protections once he makes a "substantial threshold showing of insanity." *Panetti,* 551 U.S. at 950, 952, 127 S.Ct. at 2856, 2858; *Ford,* 477 U.S. at 426, 106 S.Ct. at 2610 (Powell, J. concurring).

■■■ Allegations of delusional thinking are relevant to the determination of whether a prisoner is insane insofar as they impair the prisoner's concept of reality to the point that he cannot reach a rational understanding of the reason for his impending execution. *Panetti,* 551 U.S. at 958, 127 S.Ct. at 2861. A prison-

er's knowledge of the stated reasons for his execution does not foreclose a claim of incompetency to be executed. *Panetti,* 551 U.S. at 959, 127 S.Ct. at 2862. "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* "Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." *Panetti,* 551 U.S. at 960, 127 S.Ct. at 2862.

> This is not to deny the fact that a concept like rational understanding is difficult to define. And we must not ignore the concern that some prisoners, whose cases are not implicated by this decision, will fail to understand why they are to be punished on account of reasons other than those stemming from a severe mental illness. The mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered "normal," or even "rational," in a layperson's understanding of those terms. Someone who is condemned to death for an atrocious murder may be so callous as to be unrepentant; so self-centered and devoid of compassion as to lack all sense of guilt; so adept in transferring blame to others as to be considered, at least in the colloquial sense, to be out of touch with reality. Those states of mind, even if extreme compared to the criminal population at large, are not what petitioner contends lie at the threshold of a competence inquiry. The beginning of doubt about competence in a case like petitioner's is not a misanthropic personality or an amoral character. It is a psychotic disorder.

*Panetti,* 551 U.S. at 959–960, 127 S.Ct. at 2862.

### III. *Analysis*

#### A. *Petitioner is Entitled to a Determination on the Merits*

■ For the reasons set forth at length in this Court's Order issued 21, 2008, petitioner satisfied the threshold showing of insanity necessary to trigger the procedural requirements announced in *Panetti. Wood v. Quarterman*, 572 F.Supp.2d at 816–20. Insofar as the state habeas trial court and Texas Court of Criminal Appeals relied upon petitioner's failure to timely comply with Article 46.05(*l*–1) of the Texas Code of Criminal Procedure in summarily denying petitioner's request for *Panetti* review of his competence to be executed, that contention fails to foreclose federal habeas review of petitioner's *Ford/Panetti* claim herein because neither of those two state courts made any express or implied factual findings or conclusions of law specifically identifying petitioner's obvious failure to timely file his state habeas corpus application urging his *Ford/Panetti* claim as a basis for dismissing same. Ambiguous or even cryptic orders issued by the state courts will not support a finding of procedural default. *See, e.g., Ruiz v. Quarterman*, 504 F.3d 523, 532 (5th Cir. 2007). Moreover, the State of Texas cannot insulate itself from its constitutional obligations under *Panetti* by erecting arbitrary procedural barriers to the presentation of such claims.

Once petitioner made the threshold showing of insanity, it was incumbent upon the state habeas trial court to accord petitioner an opportunity to be heard. Instead, the state habeas trial court denied petitioner's requests for appointment of counsel, for appointment of a mental health expert, and for an opportunity to present evidence and be heard on the merits of his *Ford/Panetti* claim in a manner that satisfied the Supreme Court's procedural holding in *Panetti. See Panetti*, 551 U.S. at 952, 127 S.Ct. at 2858 (holding *Ford* requires, at a minimum, that a court allow a prisoner's counsel the opportunity to make an adequate response to evidence solicited by the state court). Where, as was also true in Panetti's case, the State of Texas has denied a petitioner a reasonable opportunity to present his *Panetti* claim despite a threshold showing of insanity, the federal habeas court must consider the petitioner's claim of incompetency to be executed. *Panetti*, 551 U.S. at 954, 127 S.Ct. at 2859.

#### B. *Petitioner Bears the Burden of Proof*

■ A State may presume the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence. *Cooper v. Oklahoma*, 517 U.S. 348, 355, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996); *Medina v. California*, 505 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353 (1992). This is precisely what applicable Texas law requires of a person such as petitioner, who claims to be incompetent to be executed, i.e., petitioner bears the burden of proving he is incompetent by a preponderance of the evidence. *TEX. CODE CRIM. PROC. ANN. art. 46.05(k) (Vernon Supp. 2010)*. This is consistent with the manner Texas statutes generally treat the issue of a criminal defendant's alleged insanity or incompetence.[106]

---

**106.** *See Morris v. State*, 301 S.W.3d 281, 300 n. 25 (Tex.Crim.App.2009)(holding the statutory burden is on the defendant to prove he is incompetent to stand trial); *Bigby v. State*, 892 S.W.2d 864, 870 (Tex.Crim.App.1994)(holding, at trial, a criminal defendant has the burden to prove his insanity by a preponderance of the evidence), *cert. denied*, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995); *Meraz v. State*, 785 S.W.2d 146, 150 (Tex.Crim.App.1990)(holding Sections 8.01 and 2.04 of the Texas Penal

## C. Synthesis of Petitioner's Ford/Panetti Claim

### 1. Consider the Context

█ This Court is not required to accept at face-value the assertions of Dr. Roman that petitioner's expressions of belief in a malevolent conspiracy between petitioner's prosecutor and trial judge are sincere expressions of a belief deeply-held by petitioner. On the contrary, this Court finds, as respondent correctly points out, there is considerable evidence in the record suggesting petitioner's assertion of his conspiracy theory is little more than a "ruse" by petitioner to avoid his own execution.

Chief among the suspicious circumstances underlying petitioner's Ford/Panetti claim herein is the fact there is no credible evidence in the record now before this Court establishing petitioner has ever described to anyone other than Dr. Roman, Dr. Conroy (and her graduate student), and petitioner's federal habeas counsel herein petitioner's theory that his prosecutor and trial judge conspired to convict and sentence petitioner to death. Petitioner did not testify before this Court and did not call any witnesses other than Dr. Roman to testify about petitioner's professions of his conspiracy theory.

This Court's independent review of the petitioner's TDCJ/UTMB medical records, correspondence, and audio recordings from August, 2008 reveal petitioner to be fully capable of expounding, and even pontificating, upon what he perceives to be the unjustness of his own capital murder conviction and death sentence, the Texas law of parties, and a wide variety of other issues relating to the Texas death penalty (including the commutation of Kenneth Foster's death sentence). Yet nowhere in those records or recordings did petitioner ever complain with any intelligible specificity about an alleged malevolent conspiracy between his prosecutor and trial judge. To be sure, in his conversations with family members, petitioner expressed disdain for his prosecutor, whom petitioner accused in his conversations with family members in August, 2008 of unfairness for seeking a death sentence for petitioner after petitioner rejected a plea bargain offer that included a life sentence. Still, there is no mention by petitioner in his recorded conversations, medical records, or correspondence of the Freemasons, the Masons, or any overarching conspiracy to deprive petitioner of his life along the lines of that described by Dr. Roman in his report and testimony herein or by petitioner's federal habeas counsel in petitioner's motion for stay of execution. There is no credible evidence currently before this Court establishing that petitioner has ever told anyone other than his own counsel herein, Dr. Roman, and Dr. Conroy (and her graduate student associate) about the alleged conspiracy between petitioner's prosecutor and trial judge.[107]

---

Code work together to impose the burden on the defendant to prove insanity by a preponderance of the evidence). The Texas Penal Code provides in pertinent part as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.
> (b) The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

TEX PENAL CODE ANN. § 8.01 (Vernon 2003).

**107.** This Court rejects as wholly incredible the hearsay affidavit of petitioner's fellow death row inmate Joseph Lave. Lave was convicted in 1994 of capital murder under the Texas law of parties for his participation in a robbery/murder. *Lave v. Dretke,* 416 F.3d 372, 375–77 (5th Cir.2005), *cert. denied,* 549

Second, the timing of petitioner's assertion of his conspiracy is likewise suspicious. There is no credible evidence before this Court suggesting petitioner ever voiced his current conspiracy theory to *anyone* prior to the Supreme Court's issuance of its opinion in *Panetti* on June 28, 2007. It is simply irrational to believe that a person who perceived himself to have been the victim of a malevolent conspiracy to convict him of a crime he did not commit and sentence him to the death penalty would remain completely and totally silent about that fact for more than a decade while he watched the residents of his TDCJ facility being marched to the death chamber.

Third, the lack of specificity underlying petitioner's conspiracy theory raises serious doubts in this Court's mind as to whether that theory is the "fixed false belief," Dr. Roman seems to believe. Dr. Roman admitted during his testimony before this Court that, to the extent petitioner cannot fully elucidate the details of his conspiracy theory, it becomes questionable whether petitioner's purported belief system is truly a delusion.[108] There is a remarkable lack of specificity in petition-

er's professions that his prosecutor and trial judge somehow conspired to convict him and sentence him to death. On the contrary, having carefully reviewed the entire record in this case, both in anticipation of the evidentiary hearing and again after receipt of the parties' final briefing, this Court finds no credible evidence exists in the record establishing petitioner's expressions of his belief in a conspiracy between his prosecutor and trial judge have ever included any pertinent details regarding precisely how such an alleged conspiracy was carried out.

For instance, petitioner does not allege any specific facts showing precisely how either his prosecutor or his trial judge intervened in the grand jury process that resulted in the return of the capital murder indictment against petitioner on January 22, 1996. Nor does petitioner offer any details regarding precisely how his prosecutor and trial judge acted in a manner to ensure petitioner's conviction. Even as early as October, 1997, Dr. Roman admitted petitioner possessed a high degree of familiarity with the criminal proceedings against him.[109] Despite having had almost

---

U.S. 1264, 127 S.Ct. 1482, 167 L.Ed.2d 227 (2007). Lave has managed, through the filing of successive state and federal habeas corpus actions, to avoid execution for almost two decades. *Ex parte Lave*, 2008 WL 5049908 (Tex.Crim.App. November 26, 2008). Lave is currently still on Texas death row and was available to be subpoenaed by petitioner and to testify before this Court at petitioner's evidentiary hearing in November, 2010. Like petitioner herein, Lave shares a political agenda to undermine public support for, and possibly repeal, the Texas law of parties, currently codified in Section 7.02 of the Texas Penal Code, Under such circumstances, this Court places zero evidentiary value in the highly biased, self-serving, statements contained in the hearsay affidavit of a convicted capital murderer who was never called to testify before this Court.

**108.** FEH Transcript, testimony of Dr. Michael A. Roman, at p. 31.

**109.** During petitioner's second state competency trial, held October 8, 1997, Dr. Roman testified in response to petitioner's trial counsel's questions, in pertinent part, as follows:
Q. Now, in your opinion does Mr. Wood possess a rational, as well as factual understanding of the proceedings against him?
A. Yes, he does.
Q. And can you expand on that please?
A. Mr. Wood is quite well-versed in the legal system and the various jobs that individuals perform, and over the time that I have seen him, referring primarily to the last visit, he has become yet more versed in that and he could likely write a legal text about court jobs. *There has never been a question about his ability to understand the charges, to understand what could happen or*

a decade and a half to ruminate upon the subject, petitioner has apparently never bothered to explain to anyone precisely how he was "railroaded" at the guilt-innocence phase of his trial.[110] Petitioner did not testify during the guilt-innocence phase of his capital murder trial but has never alleged any specific facts showing that he was either unaware of his right to testify on his own behalf or that his decision not to testify at the guilt-innocence phase of his capital murder trial was anything other than voluntary. Thus, the record before this Court is silent with regard to precisely how petitioner claims his prosecutor and trial judge illicitly managed to obtain a guilty verdict from petitioner's jury.

As for the punishment phase of his trial, petitioner himself turned that proceeding into a tragic farce by directing his trial counsel on the record to refrain from cross-examining any of the prosecution's witnesses, introducing any mitigating evidence, or arguing in favor of a life sentence. *See Wood v. Dretke,* 386 F.Supp.2d at 828–33 (detailing petitioner's highly self-destructive exchanges with his trial counsel and the trial judge). Petitioner presents this Court with no explanation, rational or otherwise, for how his prosecutor and trial judge managed to convince petitioner himself to commit suicide-by-jury during the punishment phase of his capital murder trial.

Dr. Conroy testified in a wholly credible manner that one of the ways to determine whether a person is suffering from a true delusion, as opposed to expressing something they have simply made up, is to examine whether the person has acted or behaved in conformity with the alleged delusion.[111] There is no credible evidence now before this Court establishing that petitioner has ever undertaken any action (other than filing his *Panetti* claim herein) that would indicate he is acting in conformity with, or reaction to, a delusional belief in a malevolent conspiracy between his prosecutor and trial judge.

Under the foregoing circumstances, petitioner has failed to carry his burden of proving that he does, in fact, sincerely believe his conviction resulted from a malevolent conspiracy between his prosecutor and trial judge.

### 2. Weighing the Competing Diagnoses

#### a. The DSM–IV–TR's Definition of "Delusion"

Both Dr. Roman and petitioner's federal habeas counsel employ the term "delusional" in a disturbingly casual manner that appears inconsistent with the definition of that term as used in the DSM–IV–TR. As Dr. Conroy explained during her wholly credible testimony before this Court, the glossary of technical terms found in Appendix C of the DSM–IV–TR defines "delusion" in a very specific manner:

> **delusion** A false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what

---

to understand the workings of the courtroom. (Emphasis added).

Statement of Facts from Petitioner's Competency trial held October 8, 1997 (admitted during the federal evidentiary hearing as Tab 3 of Respondent's exhibit R–2), testimony of Dr. Michael A. Roman, at pp. 194–95.

**110.** As the excerpt from petitioner's own tape-recorded confession quoted at length in note

2 *supra* amply demonstrates, there was overwhelming evidence of petitioner's guilt *under the Texas law of parties* presented during the guilt-innocence phase of petitioner's capital murder trial.

**111.** FEH Transcript, testimony of Dr. Mary Alice Conroy, at p. 145.

constitutes incontrovertible and obvious proof or evidence to the contrary. *The belief is not one ordinarily accepted by other members of the person's culture or subculture (e.g., it is not an article of religious faith).* When a false belief involves a value judgment, it is regarded as a delusion only when the judgment is so extreme as to defy credibility. Delusional conviction occurs on a continuum and can sometimes be inferred from an individual's behavior. It is often difficult to distinguish between a delusion and an overvalued idea (in which case the individual has an unreasonable belief or idea but does not hold it as firmly as is the case with a delusion).

Delusions are subdivided according to their content. Some of the more common types are listed below:

**bizarre** A delusion that involves a phenomenon that the person's culture would regard as totally implausible.

**delusional jealousy** The delusion that one's sexual partner is unfaithful.

**erotomanic** A delusion that another person, usually of higher status, is in love with the individual.

**grandiose** A delusion of inflated worth, power, knowledge, identity, or special relationship to a deity or famous person.

**mood-congruent** *See* mood-congruent psychotic features.

**mood-incongruent** *See* mood-incongruent psychotic features.

**of being controlled** A delusion in which feelings, impulses, thoughts, or actions are experienced as being under the control of some external force rather than being under one's own control.

**of reference** A delusion whose theme is that events, objects, or other persons in one's immediate environment have a particular and unusual significance. These delusions are usually of a negative or pejorative nature, but also may be grandiose in content. This differs from an *idea of reference,* in which the false belief is not as firmly held nor as fully organized into a true belief.

**persecutory** A delusion in which the central theme is that one (or someone to whom one is close) is being attacked, harassed, cheated, persecuted, or conspired against.

**somatic** A delusion whose main content pertains to the appearance or functioning of one's body.

**thought broadcasting** The delusion that one's thoughts are being broadcast out loud so that they can be perceived by others.

**thought insertion** The delusion that certain of one's thoughts are not one's own, but rather are inserted into one's mind.[112]

Throughout his written reports and testimony before both petitioner's state trial court and this Court, Dr. Roman employed the term "delusional" with an extremely broad brush, applying it to almost any belief possessed by petitioner that Dr. Roman did not consider to be factually accurate or subjectively rational. For instance, in his report bearing a computer-generated transmittal date of April 10, 1997 (based on evaluations performed on June 11 & 18, 1996), Dr. Roman reported the following clinical impressions:

*Clinical Impressions:* The results of the current evaluation indicate that Mr.

**112. American Psychiatric Association,** *Diagnostic and Statistical Manual of Mental Disorders* (4th Edition Text Revised) ("DSM–IV– TR")(2000), at pp. 821–22 (Emphasis added).

Wood has low average general intellectual abilities. Problems with language abilities, memory, learning, and attention were notable and seem to have been present for many years. These cognitive problems are consistent with the learning disability that Mr. Wood demonstrated throughout his childhood and adolescence. There is no evidence to suggest that he has any more major, acquired neuropsychological disorder. Furthermore, there is no reason to believe that he would not be aware of an able to assume responsibility for the consequences of his actions, at least from a cognitive perspective.

Mr. Wood's emotional functioning is far more complicated. He appears to have failed in many things throughout his life. As a function of this, he has developed very well ingrained defense mechanisms to attempt to cope with his low self-image, depression, and anxiety. There is evidence that he experiences negative emotion just as normally as anyone his age. However, he tends to actively deny these feelings and projects a very sturdy "bad boy" image. he seems so threatened by his personality weaknesses that he is unwilling and perhaps unable to admit to even minor faults. While it is not unusual for people accused of a serious crime to deny responsibility and fabricate their stories, it appears that this simple explanation does not apply to Mr. Wood. His denial of responsibility is totally **delusional** and he is unwilling to explore even the *possibility* that he must reconsider his beliefs. This is complicated by his mistrust of others and the degree of paranoia associated with this mistrust.

With regard to the legal questions posed to me, I do not believe Mr. Wood is particularly dangerous. His poor judgment does place him at risk for further misbehavior, including possible violations of the law; however, it appears unlikely that he would act out aggressively. There is no reason to believe, based on my evaluation, that he should not be held accountable for his actions in the past or in the future. However, it does not appear that he is capable of assisting his attorneys in his defense. I do not believe Mr. Wood is presently capable of standing trial. While he can understand the charges against him and can appreciate the consequences of being found guilty, he is totally unwilling to consider the possibility that he may be found culpable in any way. The extent of his **delusional** thinking with regard to this issue is consistent with other aspects of his personality and does not seem to be simply a convenient creation to avoid responsibility for the crimes with which he is charged. I do believe it may be possible for him to become competent to stand trial if appropriate psychotherapy is undertaken, perhaps along with the use of medication, to address his paranoid and **delusional** belief system.[113]

Despite the multiple references in his 1996–97 report to petitioner's allegedly "delusional" thought processes, at that time, Dr. Roman did not diagnose petitioner with "delusional disorder" or any other psychotic mental disorder. Instead, Dr.

---

113. Report of Dr. Michael A. Roman, admitted as defendant's exhibit no. 2 during petitioner's October 9, 1997 state competency trial, found behind Tab 4 in Respondent's exhibit R–2, at p. 5. Another copy of Dr. Roman's report in question was also admitted into evidence during the federal evidentiary hearing as Petitioner's Exhibit no. 2. Petitioner also attached a copy of the same report by Dr. Roman as an unnumbered exhibit to Petitioner's [Amended] Petition for Writ of Habeas Corpus, filed March 23, 2009, docket entry no. 65.

Roman's diagnosis included (1) dysthymic disorder, early onset, (2) attention deficit hyperactivity disorder, combined type, (3) conduct disorder, childhood onset, (4) learning disorder, NOS, and (5) paranoid personality disorder.[114]

There is nothing in Dr. Roman's 1996–97 report or testimony before the state trial court during petitioner's multiple competency trials suggesting he had concluded petitioner was then suffering from a "delusional disorder" within the meaning of DSM–IV–TR's Section 297.1:

> The essential feature of Delusional Disorder is the presence of one or more nonbizarre delusions that persist for at least 1 month (Criterion A). A diagnosis of Delusional Disorder is not given if the individual has ever had a symptom presentation that met Criterion A for Schizophrenia (Criterion B). Auditory or visual hallucinations, if present, are not prominent. Tactile or olfactory hallucinations may be present (and prominent) if they are related to the delusional theme (e.g., the sensation of being infested with insects associated with delusions of infestation, or the perception that one emits a foul odor from a body orifice associated with delusions of reference). Apart from the direct impact of the delusions, psychosocial functioning is not markedly impaired, and behavior is neither obviously odd nor bizarre (Criterion C). If mood episodes occur concurrently with the delusions, the total duration of these mood episodes is relatively brief compared to the total duration of the delusional periods (Criterion D). The delusions are not due to the direct physiological effects of a substance (e.g., cocaine) or a general medical condition (e.g., Alzheimer's disease, systemic lupus erythematosus)(Criterion E).

> Although the determination of whether delusions are bizarre is considered to be especially important in distinguishing between Delusional Disorder and Schizophrenia, *"bizarreness" may be difficult to judge, especially across different cultures.* Delusions are deemed bizarre if they are clearly implausible, not understandable, and not derived from ordinary life experiences (e.g., an individual's belief that a stranger has removed his or her internal organs and replaced them with someone else's organs without leaving any wounds or scars). In contrast, *nonbizarre delusions involve situations that can conceivably occur in real life (e.g., being followed, poisoned, infected, loved at a distance, or deceived by one's spouse or lover).*

> Psychosocial functioning is variable. Some individuals may appear to be relatively unimpaired in their interpersonal and occupational roles. In others, the impairment may be substantial and include low or absent occupational functioning and social isolation. When poor psychosocial functioning is present in Delusional Disorder, it arises directly from the delusional beliefs themselves. For example, an individual who is convinced that he will be murdered by "Mafia hit men" may quit his job and refuse to leave his house except late at night and only when dressed in clothes quite different from his normal attire. All of this behavior is an understandable attempt to prevent being identified and killed by his presumed assassins. In contrast, poor functioning in Schizophrenia may be due to both positive and

---

**114.** Report of Dr. Michael A. Roman, Petitioner's FEH Exhibit no. 2, at p. 5; Respondent's FEH Exhibit R–2, Tab 4, at p. 5.

negative symptoms (particularly avolition). Similarly, a common characteristic of individuals with Delusional Disorder is the apparent normality of their behavior and appearance when their delusional ideas are not being discussed or acted on. In general, social and marital functioning are more likely to be impaired than intellectual and occupational functioning.[115]

While "loose language" by an advocate can sometimes be excused, Dr. Roman's peculiar predilection toward labeling petitioner's pretrial insistence on his own factual innocence "delusional" raises questions about the validity of Dr. Roman's use of that same label when addressing petitioner's post-trial insistence he was "railroaded" or otherwise unjustly convicted. Furthermore, Dr. Roman appears to disagree implicitly with the United States Supreme Court:

> Someone who is condemned to death for an atrocious murder may be so callous as to be unrepentant; so self-centered and devoid of compassion as to lack all sense of guilt; so adept in transferring blame to others as to be considered, at least in the colloquial sense, to be out of touch with reality.

*Panetti,* 551 U.S. at 959–60, 127 S.Ct. at 2862.

Further diminishing the efficacy of Dr. Roman's diagnosis is the fact Dr. Roman appeared confused, or at least confusing, in his testimony before this Court regarding whether petitioner's allegedly delusional belief system was bizarre or non-bizarre within the meaning of the DSM–IV–TR. As is explained above, the DSM–IV–TR explains the difference between "bizarre" and "nonbizarre" delusions as the difference between those delusions which are "clearly implausible, not understandable, and not derived from ordinary life experiences" (i.e., bizarre) and those which "involve situations that can conceivably occur in real life" (i.e., nonbizarre).[116] Dr. Roman concluded in his written report of September, 2009 that petitioner suffers from a "nonbizarre" delusion.[117] However, when Dr. Roman attempted to explain himself during his testimony before this Court, the issue became more than fuzzy:

> The point is it is supposed to be absurd. If we had evidence that there was corruption, that is a whole different matter; it would not be delusional. What he purports must be absurd. Ironically, the fact that Your Honor says this is crazy, are you kidding me, is exactly what one should say when they hear about the presence of a delusional system. It should defy common sense. It should be outrageous. It should be the kind of thing that a rational person would reject out of hand as just totally ridiculous and unworthy of further consideration.[118]

Thus, Dr. Roman appeared to argue during his testimony that a delusion, by definition, must be "absurd," "crazy," or "totally ridiculous and unworthy of further consid-

**115. American Psychiatric Association,** *Diagnostic and Statistical Manual of Mental Disorders* (4th Edition Text Revised) ("DSM–IV–TR")(2000), Delusional Disorder 297.1, at pp. 323–24 (Emphasis added).

**116.** DSM–IV–TR (4th Edition Text Revision) (2000), at p. 324.

**117.** Report of Dr. Michael A. Roman, dated September 21, 2009, attached to Petitioner's Supplement to Petition for Writ of Habeas Corpus, filed September 30, 2009, docket entry no. 83, at p. 9. A copy of Dr. Roman's September, 2009 report was also admitted during the evidentiary hearing as Petitioner's Exhibit no. 1.

**118.** Transcript, testimony of Dr. Michael A. Roman, at p. 38.

eration." However, this is not how the DSM–IV–TR describes the nonbizarre delusions that form an essential feature of a true "delusional disorder." [119]

Furthermore, in his 1996–97 report, as well as his September, 2009 report and testimony before this Court, Dr. Roman also appears to have implicitly rejected the possibility that petitioner's refusal to accept responsibility for his offense (something Dr. Roman stated in his report he felt petitioner was fully capable of doing in 1996–97) was the product of an antisocial personality, a personality disorder which Dr. Roman agreed in his testimony before this Court applies to petitioner.[120] As will be discussed in greater detail hereinafter, Dr. Roman's failure to note petitioner's long-standing diagnosis of antisocial personality in any of his reports currently before this Court raises additional questions about the efficacy of Dr. Roman's conclusions.

b. *Failure to Consider Petitioner's Subculture*

Dr. Roman's approach to diagnosing petitioner's alleged "delusional disorder" in September, 2009 is troubling for two additional reasons. The first is the fact that, as noted by both respondent and Dr. Conroy in her testimony before this Court,[121] the DSM–IV–TR *requires* consideration of an individual's cultural and religious background when evaluating the possible presence of delusional disorder.[122] At no point in his written report or initial testimony before this Court did Dr. Roman make

any. reference to the fact petitioner has spent the last decade and a half on Texas' death row, surrounded by a large group of highly litigious, violent, felons convicted of some of the most heinous crimes imaginable. In fact, the absence from Dr. Roman's September, 2009 report of any mention of DSM–IV–TR's directive that cultural and religious background be considered in making a diagnosis of "delusional disorder" is more than merely noticeable; it borders on the deceptive. Dr. Roman's recitation of (and carefully edited quotations from) the relevant portions of the DSM–IV–TR omit any reference to this requirement. Likewise, Dr. Roman made no effort to address petitioner's culture or subculture when he testified before this Court. Given Dr. Roman's comparatively sparse experience dealing with adults who have been housed in a maximum security setting, perhaps this omission is not surprising.[123] Given the plain language of DSM–IV–TR, however, this omission from Dr. Roman's written report and testimony before this Court nonetheless greatly diminishes the credibility of Dr. Roman's conclusions.

As was explained above, Dr. Conroy expressed the opinion, based upon her considerable experience working as a forensic psychologist with the Federal Bureau of Prisons for more than two decades, that it was quite common for inmates in maximum security prisons to belief the government was "out to get them" but that such beliefs do not constitute "delusional disor-

---

**119.** *See note 115, supra, and accompanying text.*

**120.** FEH Transcript, testimony of Dr. Michael A. Roman, at pp. 39–40, 47.

**121.** FEH Transcript, testimony of Dr. Mary Alice Conroy, at pp. 147–48, 170–71.

**122.** *See note 91, supra.*

**123.** Dr. Roman, a neuropsychologist by training and experience, testified his work evaluating petitioner's competency to stand trial in 1996–97 was his first endeavor with evaluating an adult criminal defendant and that he has had very little experience dealing with adult criminals since then. FEH Transcript, testimony of Dr. Michael A. Roman, at pp. 84–87.

ders" within the meaning of the DSM–IV–TR nor do they portend any other psychotic disorder.[124] On the contrary, Dr. Conroy opined, the wide-spread belief within prison populations that individuals within the state or federal government have conspired to unjustly convict and sentence "innocent" individuals is, for many prison inmates, simply a means of "rationalizing" their current situations.[125]

While Dr. Roman attempted to criticize Dr. Conroy's opinions regarding the wide-spread prevalence of persecutorial beliefs within prison populations due to the lack of empirical data supporting Dr. Conroy's opinions,[126] this Court finds Dr. Roman's criticism sorely lacking in merit.

This Court has spent more years than petitioner has thus far resided on Texas' death row reviewing hundreds of pro se prisoner civil rights complaints, pro se federal habeas corpus petitions, and pro se Section 2255 motions, not to mention innumerable pages of TDCJ prisoner medical, disciplinary, and grievance records. This Court has also reviewed voluminous records in more than a dozen death penalty habeas corpus cases besides petitioner's. At a minimum, this Court is entitled to make the following observations without fear of error: (1) the Institutional Division of the Texas Department of Criminal Justice is home to a population in which antisocial personality disorder occurs far more frequently than it does in the general population (the DSM–IV–TR reported a 3% rate for the general male population in 2000)[127]; (2) the incidence of antisocial behavior, i.e., conduct consistent with the psychoanalytical definition of antisocial personality disorder,[128] is at epidemic proportions among Texas prison inmates; and (3) virtually all of the Texas death row inmates with whom this Court has dealt have been diagnosed by qualified mental health professionals with antisocial personality disorder. It has been this Court's experience that the vast majority of Texas prison inmates in general, and Texas death row inmates in particular, demonstrate several significant characteristics of antisocial personality disorder, specifically, an unwillingness to accept responsibility for their criminal conduct (often accompanied by facile expressions of persecutorial beliefs directed toward law enforcement officers and agencies); an unwillingness to express sincere contrition or remorse toward their victims; deceitful and manipulative conduct; and a marked tendency toward displaying indifference toward, or making superficial, insincere, rationalizations for, having harmed others. Dr. Con-

---

124. FEH Transcript, testimony of Dr. Mary Alice Conroy, at pp. 146–50.

125. *Id.*

126. FEH Transcript, testimony of Dr. Michael A. Roman, at pp. 194–95.

127. DSM–IV–TR (4th Edition) (2000), at p. 704.

128. The DSM–IV–TR states that antisocial personality disorder is characterized by (1) a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood, (2) "deceit and manipulation," (3) failure to conform to social norms with respect to lawful behavior, (4) disregard for the rights, wishes, or feelings of others, (5) lies, deception, and malingering, (6) a pattern of impulsivity, (7) reckless disregard for the safety of themselves or others, (8) an unwillingness to show remorse for the consequences of their actions, (9) indifference to, or rationalization for, having hurt, mistreated, or stolen from others, (10) a lack of empathy, (11) callous, cynical, and contemptuous treatment of the rights, feelings, and suffering of others, (12) an inflated and arrogant self-appraisal, (13) being excessively opinionated, self-assured, or cocky, and (14) superficial charm. DSM–IV–TR (4th Edition Text Revision) (2000), at pp. 701–03.

roy's opinions regarding the widespread nature of rationalizing belief systems within prison systems are fully consistent with this Court's experiences over nearly two decades dealing with pro se prisoner litigants and death row federal habeas corpus petitioners. This Court finds Dr. Conroy's testimony regarding the widespread presence of rationalizing belief systems within prison inmate populations fully credible in view of her considerable experience and this Court's own experience.

The reality facing this Court is that petitioner, who prior to September, 2009 had never been diagnosed with a delusional disorder or any other psychotic disorder (including by Dr. Roman himself), appears to have first expressed a rather superficial "conspiracy theory" about unspecified, concerted, malevolent acts engaged in by his prosecutor and trial judge which led to his conviction and death sentence. Dr. Roman appears convinced petitioner holds a sincere belief in this rather vaguely defined conspiracy theory. Yet Dr. Roman has made no genuine effort to address the relationship between petitioner's antisocial personality the beliefs about a conspiracy that petitioner has expressed to Dr. Roman and only a handful of others. In light of the agreement of all the experts who testified before this Court that petitioner does display an antisocial personality, this failure by Dr. Roman devalues even more his diagnosis of delusional disorder.

Petitioner lives, and has lived for almost a decade and a half, in an environment in which antisocial conduct and thought processes are the norm. Petitioner demonstrates the classic characteristics of an individual displaying antisocial personality disorder. It is this Court's experience (based on review of hundreds, if not thou-

sands, of prisoner pleadings and prisoner records) that beliefs in malevolent prosecution of "innocent" persons by the State of Texas are widespread within the Texas prison inmate population. It is this Court's experience that antisocial personality disorder is even more prevalent on Texas' death row than in the general Texas prison population. There are few first time offenders on Texas' death row. Thus, the culture of the Texas prison inmate population in general, and subculture of the Texas death row inmate population in particular, is far from hostile to individual beliefs in persecutorial behavior by the State of Texas and its law enforcement agencies, officials, and officers. Under such circumstances, petitioner's refusal to accept responsibility for his own criminal conduct and his expressions of facile rationalizations for his presence on death row do not render his vague conspiracy theory evidence of a "delusional disorder" within the meaning of DSM–IV–TR.

This Court finds fully credible Dr. Conroy's opinion that petitioner's statements to her about his offense and current death sentence were not "delusional" within the meaning of the DSM–IV–TR but, rather, manifestations of petitioner's unwillingness to accept responsibility for his own misconduct and petitioner's fundamental disagreement with the philosophical underpinnings for the Texas law of parties.[129] This Court also finds fully credible Dr. Conroy's testimony that petitioner's beliefs about his conviction and death sentence are fully rational and self-serving, rather than "delusional" within the meaning of the DSM–IV–TR.[130]

### c. Dr. Roman's Reliance on Peters Delusions Inventory

Respondent correctly points out that, in his written report issued in September,

---

**129.** FEH Transcript, testimony of Dr. Mary Alice Conroy, at pp. 143–47.

**130.** *Id.,* at pp. 147–50.

2009, Dr. Roman expressly relied on petitioner's responses to the Peters Delusions Inventory in determining that petitioner suffers from a "delusional disorder." Dr. Conroy took exception to the use of that test instrument to help diagnose a mental disorder under the DSM–IV–TR, arguing that instrument was not designed to help diagnose mental disorders and that the term "delusion" employed by Dr. Peters and her colleagues meant something entirely different from the meaning of that term within the DSM–IV–TR.[131] Dr. Roman subsequently admitted that the Peters Delusions Inventory is not a proper test instrument for evaluating an individual for "delusional disorder" within the meaning of the DSM–IV–TR.[132] This Court shares Dr. Conroy's concern over Dr. Roman's reliance on petitioner's responses to the Peters Delusions Inventory in diagnosing petitioner.

The point is not that Dr. Roman employed a single test, among many others, which he now admits had little utility in evaluating petitioner for a true mental disorder. Rather, the problem is that Dr. Roman spent seven full paragraphs and almost a full page in his written report of September, 2009 relating the details of petitioner's responses to the Peters Delusions Inventory in a manner suggesting Dr. Roman found petitioner's responses thereto very significant to his diagnosis of "delusional disorder." It is not an exaggeration to state that, in his report, Dr. Roman appears to rely significantly, if not primarily, upon petitioner's responses to the Peters Delusions Inventory in reaching Dr. Roman's diagnosis that petitioner suffers from a persecutorial delusional disorder. In light of Dr. Roman's subsequent admission as to the limited utility of the Peters Delusions Inventory, this Court finds even more evidence in the record to question the efficacy of Dr. Roman's "delusional" diagnosis.

### 3. Conclusions

This Court is confronted with a death row inmate whom Dr. Roman described in 1997 as "quite well versed in the legal system." Petitioner was sophisticated enough at his trial in 1998 to direct his trial counsel to sit on their hands during the punishment phase of petitioner's capital murder trial and then petitioner argued in his state habeas corpus and federal habeas corpus proceedings that his trial counsel had rendered ineffective assistance by following petitioner's express directives. Petitioner's level of legal sophistication, according to Dr. Roman in his 2009 report, has only increased in the years since.

There is no credible evidence before this Court establishing petitioner ever expressed his belief in a conspiracy between his prosecutor and trial judge prior to the date the Supreme Court issued its opinion in *Panetti,* i.e., June 29, 2007. There is no credible evidence before this Court establishing petitioner has ever expressed his conspiracy theory to anyone other than his federal habeas counsel and the mental health experts employed in connection with this cause. Petitioner is a highly manipulative antisocial personality who made a suicidal gesture in September, 2010 on the eve of a hearing setting in this cause which petitioner later explained was intended to permit him to get a hearing from mental health staff at the Jester 4 Unit on petitioner's grievance against TDCJ guards at his unit. Throughout his stay in the custody of the TDCJ, petitioner has repeatedly engaged in manipulative behavior. One of the distinguishing char-

---

**131.** *Id.,* at pp. 153–54.

**132.** FEH Transcript, testimony of Dr. Michael Roman, at pp. 200–02.

acteristics of an antisocial personality is the tendency to engage in deceitful, manipulative, behavior. Other characteristics include the tendency toward rationalizing one's criminal conduct and blaming others for one's own misbehavior. Under such circumstances, this Court finds there is no credible evidence establishing petitioner sincerely believes the conspiracy theory he expressed for the first time after the issuance of the Supreme Court's *Panetti* decision.

This Court finds wholly credible the opinions and conclusions of Dr. Mary Alice Conroy and Dr. Shelia Bailey that (1) petitioner possesses an accurate, rational, understanding of the factual and legal bases for his capital murder conviction and sentence of death, (2) petitioner possesses a rational understanding of the link between his conviction and his death sentence, and (3) petitioner is fully capable of understanding, and in fact does understand, the reason he is to be executed is for his role in the fatal shooting of Kriss Keeran. This Court finds petitioner has chosen to express his conspiracy theory, expressed to Dr. Roman and only a handful of others, as a deliberate ploy or ruse to avoid his own execution. This Court finds incredible the conclusions and diagnosis of Dr. Michael A. Roman suggesting petitioner suffers from a "persecutorial delusional disorder."

This Court finds petitioner displays the characteristics of an individual with antisocial personality disorder. This Court finds petitioner does not currently suffer from a delusional disorder or any other psychotic disorder. On the contrary, Justice Kennedy may have had petitioner in mind when he wrote for the Supreme Court in *Panetti* that some convicted capital murderers "may be so callous as to be unrepentant; so self-centered and devoid of compassion as to lack all sense of guilt; so adept in

transferring blame to others as to be considered, at least in the colloquial sense, to be out of touch with reality." *Panetti,* 551 U.S. at 960, 127 S.Ct. at 2862. Petitioner's refusal to accept any responsibility for his role in Keeran's murder, his fundamental objection to the Texas law of parties, and his expression of a rather vague conspiracy theory involving his prosecutor and trial judge do not constitute evidence of a "delusional disorder," within the meaning of the DSM–IV–TR. Rather, they reflect petitioner's extremely antisocial personality.

This Court finds petitioner fully understands he has been convicted of capital murder for his role in Keeran's murder. This Court finds petitioner fully understands he will be put to death for his role in Keeran's murder. This Court concludes petitioner has a rational understanding of the reason for his death sentence, as well as the causal link between his role in Keeran's murder and his impending execution.

In sum, this Court rejects petitioner's claim that he is incompetent to be executed on the merits because: (1) petitioner's complaints about a conspiracy between his prosecutor and trial judge are not credible given (a) their suspiciously sudden appearance after the Supreme Court's *Panetti* decision was handed down, (b) their remarkable non-specificity (petitioner never explains **how** his prosecutor and trial judge supposedly managed to execute the conspiracy), and (c) the fact petitioner apparently never told anyone other than his lawyer about his conspiracy theory until he filed his *Ford/Panetti* claim in August, 2008; (2) Dr. Roman's diagnosis of petitioner's "persecutory delusional disorder" is incredible because that diagnosis (a) is inconsistent with what Dr. Roman reported in his 1996–97 evaluation of petitioner, (b) appears to be premised upon an erroneous perception of the precise contours of a "delusional disorder," as defined by the

DSM–IV–TR, (c) relies extensively upon petitioner's responses to a test instrument (the Peters Delusions Inventory) which Dr. Roman admits has no relevance to a diagnosis of "delusional disorder" under the DSM–IV–TR, (d) is undermined by the fact Dr. Roman has very little experience dealing with antisocial personalities like petitioner, and (e) ignores the relevant fact petitioner has spent the last decade and a half on death row, living with many other antisocial personalities, most of whom also refuse to accept responsibility for their crimes and tend to shift blame to others for their own criminal actions, *i.e.*, Dr. Roman ignored petitioner's culture or sub-culture—something the DSM–IV–TR requires before a diagnosis of "delusional disorder" can be made; (3) Dr. Conroy, who possesses a great deal of experience dealing with incarcerated criminals, testified in a wholly credible manner that petitioner's "conspiracy theory" was little more than an attempt by petitioner to rationalize his current predicament; (4) Dr. Bailey, who evaluated petitioner in September, 2010, testified in a wholly credible manner that petitioner never told her about any conspiracy theory but, instead, simply repeated the same complaints about what petitioner perceives to be the unjustness of his conviction under the Texas law of parties that petitioner has been asserting for more than a decade and a half; and (5) this Court independently concludes petitioner's belief that it is unfair or unjust that he should be sentenced to death even though he was not the trigger man does not constitute a "delusional disorder" within the meaning of that term in the DSM–IV–TR. Dr. Roman's diagnosis is simply unworthy of belief. Dr. Conroy's contrasting diagnosis, which is confirmed by the recent clinical impressions of Dr. Bailey and consistent with more than a decade of petitioner's TDCJ medical and mental health records, is wholly credible.

Therefore, petitioner's *Ford/Panetti* claim lacks any arguable merit. Petitioner is entitled to neither federal habeas corpus relief from this Court nor a continuation of his stay of execution.

## IV. *Certificate of Appealability*

### A. *The Necessity for Obtaining a CoA*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998). Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters a final order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas

petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

### B. *The Standard for Obtaining a CoA*

■ A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at

1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (quoting *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial

of a constitutional right and (2) the district court's procedural ruling was correct).

■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman,* 560 F.3d 299, 304 (5th Cir.), *cert. denied,* —— U.S. ——, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009); *Moore v. Quarterman,* 534 F.3d 454, 460 (5th Cir.2008); *Foster v. Quarterman,* 466 F.3d at 364; *Dickson v. Quarterman,* 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke,* 434 F.3d at 787; *Bridgers v. Dretke,* 431 F.3d 853, 861 (5th Cir.2005), *cert. denied,* 548 U.S. 909, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller–El v. Cockrell,* 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman,* 476 F.3d at 364–69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

## C. *Synthesis*

■ This Court is convinced petitioner fabricated his current conspiracy theory *after* the Supreme Court handed down its *Panetti* decision. It defies credulity to believe that a prisoner as boisterous in his proclamation of his "innocence" as petitioner would remain completely silent for more than a decade about a conspiracy to convict him of a crime he did not commit and to sentence him to death if that same prisoner sincerely believed said conspiracy theory. Petitioner has never been reluctant to voice his fundamental disagreement with the Texas law of parties or to decry what he perceives to be the unjustness of his own capital murder conviction and death sentence. But, as was the case when he encountered Dr. Bailey at the Jester 4 Unit in September, 2010, petition-

er's complaints have always focused on petitioner's contention that it is unfair and unjust for him to be held legally responsible for Keeran's murder when Reneau was the trigger man and petitioner was outside the convenience store when Reneau fatally shot Keeran. These are not delusional or even irrational beliefs. They simply reflect petitioner's unwillingness to accept responsibility for his role in Keeran's murder.

Given petitioner's highly antisocial personality, a salient point no one appears to dispute, petitioner's refusal to accept responsibility for his own criminal conduct and his efforts to blame others for his current residence on Texas' death row are hardly surprising. Simply put, petitioner conned Dr. Roman with his latest conspiracy theory. Given Dr. Roman's scant experience dealing with antisocial personalities, and relative inexperience evaluating the mental health of adults housed in penal institutions, this is also hardly surprising. What is surprising is the extremely lax methodology Dr. Roman employed when making his diagnosis of petitioner's alleged "delusional disorder." Dr. Roman relied heavily upon petitioner's responses to a test instrument (the Peters Delusions Inventory) that even he was forced to admit bore no relationship whatsoever to a diagnosis of a true "delusional disorder" within the meaning of the DSM–IV–TR. Dr. Roman also appeared confused about the type of belief that would support a finding of "delusional disorder" under the DSM–IV–TR, completely ignored the DSM–IV–TR's requirement that consideration be given to the individual's relevant culture or subculture in making a diagnosis of "delusional disorder," and has accepted at face value petitioner's assertions of a conspiracy theory that apparently blossomed into existence for the first time only after the Supreme Court's *Panetti* decision and

which petitioner has shared with no one outside his own legal defense team and the respondent's experts herein.

Reasonable jurists could not disagree with this Court's conclusion that Dr. Roman's reports and testimonial opinions fail to give any consideration to the highly antisocial nature of petitioner's current subculture. Once more, given Dr. Roman's relative lack of experience dealing with incarcerated adults, this is not surprising. This Court's own experience dealing with hundreds, if not thousands, of pro se prisoner filings over nearly two decades convinces this Court that Dr. Conroy's and Dr. Bailey's opinions about the widespread prevalence of non-delusional, persecutorial, beliefs among prison inmate populations are accurate and fully credible. Antisocial personalities such as petitioner simply do not accept responsibility for their own misconduct. Moreover, there is nothing irrational with such widespread beliefs. It is an unfortunate reality that, occasionally, those charged with securing and caring for highly antisocial personalities often find their patience tried, their professionalism challenged, and their ability to tolerate the antisocial behavior of those in their care insufficient to prevent them from employing verbally abusive language or from responding to antisocial behavior in a less than professional manner. This Court has no doubt petitioner has experienced at least some unprofessional conduct by the TDCJ personnel charged with securing and caring for him. On at least one occasion, a TDCJ employee who investigated petitioner's complaints that he had been verbally abused by guards found independent evidence corroborating petitioner's complaint.[133]

Reasonable minds could not disagree with this Court's conclusion that petitioner is a highly antisocial personality who routinely engages in manipulative behavior (such as his August, 2010 suicidal gesture) to get what he wants. Nor could reasonable jurists disagree with this Court's conclusion that petitioner's rather vague statements about the existence of a conspiracy between his prosecutor and trial judge are unsupported by any specific factual allegations regarding precisely how those two individuals managed to orchestrate petitioner's capital murder indictment, trial, and conviction, much less petitioner's death sentence. For a person whom Dr. Roman has repeatedly described as possessing a detailed knowledge of the legal system, this omission from petitioner's conspiracy theory is significant. It greatly diminishes the credibility of petitioner's assertions that he sincerely believes he has been the victim of a malevolent conspiracy between his prosecutor and trial judge.

Petitioner's conspiracy theory lacks the specificity of a true "delusional disorder" as defined by the DSM–IV–TR. Instead, it appears to be precisely what Dr. Conroy termed it, i.e., a form of rationalization for petitioner's current residence on death row. As Dr. Conroy explained, in a wholly credible manner, when viewed objectively, petitioner's expressions of belief in a malevolent conspiracy between his prosecutor and trial judge are wholly self-serving: the existence of such a conspiracy would absolve petitioner of his legal and moral culpability for his role in Keeran's murder.

Dr. Bailey evaluated petitioner more recently than either Dr. Roman or Dr. Conroy and testified in a wholly credible manner that petitioner never mentioned to her any theory about a conspiracy between his prosecutor and trial judge. Instead, she testified the petitioner simply repeated the

---

**133.** Petitioner's UTMB Medical Records (report dated August 19, 2004 indicated another inmate verified that guards were singling out petitioner for antagonistic behavior), at p. 93.

same complaints about what he perceives to be the unjustness of his capital murder conviction under the Texas law of parties that petitioner has asserted for a decade and a half. This Court finds fully credible the opinions and conclusions of Dr. Bailey and Dr. Conroy that (1) petitioner not only fully comprehends and understands the rationale behind his death sentence but (2) petitioner also rationally understand the causal link between his role in Keeran's murder and petitioner's impending execution. Given the record now before this Court, reasonable jurists could not conclude otherwise.

No one disputes that petitioner disagrees with the public policy underlying the Texas law of parties. Petitioner does not believe it is just or fair that he should be held legally responsible for Keeran's murder when he was neither the trigger man nor physically present inside the convenience store when Reneau fatally shot Keeran. Petitioner's fundamental disagreement with the efficacy of Section 7.02 of the Texas Penal Code does not rise to the level of a "delusional disorder" or a "psychotic disorder" within the meaning of the DSM–IV–TR. Nor does it render petitioner incompetent to be executed within the meaning of that term as employed by the Supreme Court in *Panetti*. Reasonable jurists could not disagree with this conclusion, either. Nor could reasonable jurists disagree with this Court's conclusion that petitioner's misanthropic personality and amoral character do not rise to the level of a psychotic disorder within the meaning of the DSM–IV–TR and *Panetti*.

Petitioner is not entitled to a CoA on any legal issue, procedural or substantive, in this cause.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in either petitioner's Amended Petition, filed March 23, 2009, *docket entry no. 65,* petitioner's Supplement to Petition, filed September 30, 2009, *docket entry no. 83,* or petitioner's Post–Hearing Brief, filed April 29, 2011, docket entry no. 151, is **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability.

3. Any other pending motions are **DISMISSED** as moot.

4. The portion of this Court's Order issued August 21, 2008, *docket entry no. 43,* staying petitioner's execution is **VACATED** and **RESCINDED.** This Court's stay of execution is lifted.

5. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.